## EX PARTE COLLETT.

No. 206, Misc. Argued February 7, 1949.—Decided May 31, 1949.

*Lloyd T. Bailey* argued the cause for petitioner. With him on the brief was *Theodore Granik.*

*Robert P. Hobson* argued the cause for the Honorable Fred L. Wham, United States Judge for the Eastern District of Illinois, respondent. With him on the brief was *Ernest Woodward.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

In this case we must decide whether the venue provisions of the Judicial Code [1] render applicable the doctrine of *forum non conveniens* to actions under the Federal Employers' Liability Act. [2] Petitioner instituted such an action against the Louisville and Nashville Railroad in October, 1947, in the court below, the United States District Court for the Eastern District of Illinois. No trial was had before September 1, 1948, the effective date of the present Judicial Code. [3] Thereafter the Railroad filed a motion to transfer the case to the District Court for the Eastern District of Kentucky.

The court below found that all 35 witnesses and the petitioner himself live in Irvine, Kentucky, which also was the scene of the accident; that Irvine is 420 miles, "approximately twenty-four hours . . . by public transportation," from East St. Louis, where the court below sits, but only 26 miles from Richmond and 48 from Lexington, in which two cities the District Court for the Eastern District of Kentucky sits. Furthermore, the court below determined that jury schedules at both Richmond and Lexington made early trial possible. Thus concluding that the transfer would serve the convenience of parties and witnesses, and would be in the interest of

---

[1] Act of June 25, 1948, 62 Stat. 869: "An Act To revise, codify, and enact into law title 28 of the United States Code entitled 'Judicial Code and Judiciary.'"

[2] 35 Stat. 65, as amended by 36 Stat. 291, and 53 Stat. 1404, 45 U. S. C. §§ 51–59.

[3] Act of June 25, 1948, 62 Stat. 869, 992, § 38.

justice, the District Court granted the Railroad's motion. Petitioner then filed directly in this Court a "Motion for leave to file petition for order to show cause why writs of mandamus [against the court below] and prohibition [against the Kentucky District Court] should not issue, and petition for same." Petitioner makes no allegation that the court below abused its discretion; his sole contention is that the order of transfer exceeded the District Court's authority. Since that issue seemed of importance in the administration of justice,[4] we assigned the case for hearing on the motion. 335 U. S. 897 (1948).

Prior to the current revision of Title 28 of the United States Code, *forum non conveniens* was not available in Federal Employers' Liability Act suits. *Baltimore & Ohio R. Co.* v. *Kepner,* 314 U. S. 44 (1941); *Miles* v. *Illinois Central R. Co.,* 315 U. S. 698 (1942); see *Gulf Oil Corp.* v. *Gilbert,* 330 U. S. 501, 505 (1947). The new Code, however, provides that "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." This is § 1404 (a). The reviser's notes, which accom-

---

[4] At least five district court decisions dealing with the relationship of § 1404 (a) to FELA suits have been reported. Four have held that the section is applicable. *Hayes* v. *Chicago, R. I. & P. R. Co.* (and seven other cases), 79 F. Supp. 821 (1948); *White* v. *Thompson,* 80 F. Supp. 411 (1948); *Nunn* v. *Chicago, M., St. P. & P. R. Co.,* 80 F. Supp. 745 (1948); *Scott* v. *New York Central R. Co.,* 81 F. Supp. 815 (1948); cf. *Brainard* v. *Atchison, T. & S. F. R. Co.,* 81 F. Supp. 211 (1948); *Perry* v. *Atchison, T. & S. F. R. Co.,* 82 F. Supp. 912 (1948) (in both, motion to transfer denied, in exercise of "discretionary powers"); *Chaffin* v. *Chesapeake & O. R. Co.,* 80 F. Supp. 957 (1948); *Richer* v. *Chicago, R. I. & P. R. Co.,* 80 F. Supp. 971 (1948). One reported decision has held that the Code section is inapplicable to such suits. *Pascarella* v. *New York Central R. Co.,* 81 F. Supp. 95 (1948).

pany each section of the Code, here read as follows: "Subsection (a) was drafted in accordance with the doctrine of forum non conveniens, permitting transfer to a more convenient forum, even though the venue is proper. As an example of the need of such a provision, see *Baltimore & Ohio R. Co.* v. *Kepner,* 1941, 62 S. Ct. 6, 314 U. S. 44, 86 L. Ed. 28, which was prosecuted under the Federal Employer's [*sic*] Liability Act in New York, although the accident occurred and the employee resided in Ohio. The new subsection requires the court to determine that the transfer is necessary for convenience of the parties and witnesses, and further, that it is in the interest of justice to do so." [5] The precise issue before us is whether, despite these expressions, the law remains unchanged. Petitioner so contends.

*First.* The court below relied on the language of § 1404 (a), *supra,* which it regarded as "unambiguous, direct, clear." We agree. The reach of "any civil action" [6] is unmistakable. The phrase is used without qualification, without hint that some should be excluded. From the statutory text alone, it is impossible to read the section as excising this case from "any civil action."

The only suggestion petitioner offers in this regard is that "any civil action" embraces only those actions for which special venue requirements are prescribed in §§ 1394–1403 of Revised Title 28,[7] since these sections

[5] H. R. Rep. No. 308, 80th Cong., 1st Sess. A 132 (1947); H. R. Rep. No. 2646, 79th Cong., 2d Sess. A127 (1946).

[6] The reviser's notes make clear that the phrase was substituted for "suit," formerly used in various venue statutes, in the light of Rule 2 of the Fed. Rules Civ. Proc.: "There shall be one form of action to be known as 'civil action'."

[7] Section 1394 deals with any civil action "by a national banking association to enjoin the Comptroller of the Currency"; § 1395, proceedings "for the recovery of a pecuniary fine" and "for the forfeiture of property" under varying circumstances; § 1396, "Any civil

immediately precede § 1404 (a), and all are within the
Venue Chapter (§§ 1391–1406, inclusive) of the Code.
To accept this contention, we would be required com-
pletely to disregard the Congressional admonition that
"No inference of a legislative construction is to be drawn
by reason of the chapter in Title 28 . . . in which any
any [*sic*] section is placed . . . ." [8] Furthermore, peti-.
tioner's argument proves too much: §§ 1391–1393, which
also are in the Venue Chapter and also refer to "any civil
action," would be read as applying only to actions for
which special venue requirements are established in
neighboring sections of the Code, although they were
obviously intended by Congress to be the general venue
sections applicable to ordinary actions. It seems more
reasonable to hold that § 1404 (a) in terms applies gen-
erally, *i. e.*, to "any civil action.".

.*Second.* Although petitioner wishes to restrict the lit-
eral meaning of "any civil action," he would expand the
sense of "may transfer . . . to any other district or divi-
sion where it might have been brought" beyond the exact
scope of those words. Obviously, the express language
gives no clue as to where the action "might have been
brought." .Yet the essence of petitioner's position is that
the order below, transferring his suit, effects a repeal of
§ 6 of the Federal Employers' Liability Act, which granted
him the right to sue in any district "in which the defend-

action for the collection of internal revenue taxes"; § 1397, "of
interpleader"; § 1398, "any civil action to enforce, suspend or set
aside in whole or in part an order of the Interstate Commerce Com-
mission"; § 1399, "for the partition of lands, where the United
States is one of the tenants in common or joint tenants"; § 1400,
actions "relating to copyrights" or "for patent infringement"; § 1401,
"by a stockholder on behalf of his corporation"; § 1402, "against
the United States"; and § 1403, "to condemn real estate for the
use of the United States."

[8] Act of June 25, 1948, 62 Stat. 869, 991, § 33.

ant shall be doing business at the time of commencing such action." [9]

Section 6 of the Liability Act defines the proper forum; § 1404 (a) of the Code deals with the right to transfer an action properly brought. The two sections deal with two separate and distinct problems.[10] Section 1404 (a) does not limit or otherwise modify any right granted in § 6 of the Liability Act or elsewhere to bring suit in a particular district. An action may still be brought in any court, state or federal, in which it might have been brought previously.

The Code, therefore, does not repeal § 6 of the Federal Employers' Liability Act. We agree with petitioner that Congress had no such intention, as demonstrated by its failure to list the section in the meticulously prepared schedule of statutes repealed.[11] We cannot agree that the order before us effectuates an implied repeal. The inapplicability of *forum non conveniens* to Liability Act

---

[9] "Under this chapter an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or, in which the defendant shall be doing business at the time of commencing such action. . . ." 45 U. S. C. § 56. For a brief historical sketch, see *Baltimore & O. R. Co.* v. *Kepner*, 314 U. S. 44, 49–50 (1941).

[10] In almost every state, the requirements for venue and for transfer are treated in different statutory sections. Brief for New York, C. & St. L. R. Co. as *amicus curiae*, pp. 11–12, *Kilpatrick* v. *Texas & Pac. R. Co., post*, p. 75. See, *e. g.,* N. Y. Civil Practice Act, §§ 182, 187.

[11] Act of June 25, 1948, 62 Stat. 869, 992, § 39. Congress did list the pertinent statutes, when Code provisions in fact changed the basic venue requirements. For example, §§ 1394, 1395, 1396 and 1400, respectively, prescribe a new definition of appropriate forums for actions against the Comptroller of the Currency, involving fines and forfeitures, internal revenue taxes and patent and copyright suits; and the following statutes are therefore listed as repealed: 28 U. S. C. § 110; 28 U. S. C. §§ 104, 107, 108; 28 U. S. C. § 105; 28 U. S. C. § 109 and 17 U. S. C. § 35.

suits derives from the *Kepner* decision. And there this Court expressly stated that "If it is deemed unjust, the remedy is legislative . . . ." 314 U. S. at 54. That opinion discusses § 6 of the Liability Act, to be sure, but this Court did not and could not suggest that the legislative answer had necessarily to be addressed to that section. Since the words selected by Congress for § 6 denote nothing, one way or the other, respecting *forum non conveniens,* there was no occasion to repeal that section, expressly or impliedly; Congress chose to remove its judicial gloss via another statute. Discussion of the law of implied repeals is, therefore, irrelevant.

*Third.* Petitioner's chief argument proceeds not from one side or the other of the literal boundaries of § 1404 (a), but from its legislative history. The short answer is that there is no need to refer to the legislative history where the statutory language is clear. "The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." *Gemsco* v. *Walling,* 324 U. S. 244, 260 (1945). This canon of construction has received consistent adherence in our decisions.[12]

Nevertheless, we need not rest our decision on it solely. For the legislative history does not support petitioner's position. Petitioner's argument is based on these twin premises: Congress intended no "controversial change" to be incorporated in the Code; and § 1404 (a) is such a change.

---

[12] E. g., *Packard Motor Car Co.* v. *Labor Board,* 330 U. S. 485, 492 (1947); *United States* v. *American Trucking Associations,* 310 U. S. 534, 543 (1940) and cases there cited.

The rule as to statutory revisions is the same. *Continental Casualty Co.* v. *United States,* 314 U. S. 527, 530 (1942); *Bate Refrigerating Co.* v. *Sulzberger,* 157 U. S. 1, 45 (1895); *United States* v. *Bowen,* 100 U. S. 508, 513 (1880).

To establish the former premise, petitioner cites a number of statements by legislative leaders in charge of the Code revision. For example, Representative Keogh, Chairman of the House Committee on the Revision of the Laws which initiated the work, said at the hearing before the House Judiciary Subcommittee, "The policy that we adopted . . . was to avoid wherever possible and whenever possible the adoption in our revision of what might be described as controversial substantive changes of law."[13] And Senator Donnell, Chairman of the Senate Judiciary Subcommittee considering the Code, said on the floor that ". . . the purpose of this bill is primarily to revise and codify and to enact into positive law, with such corrections as were deemed by the committee to be of substantial and noncontroversial nature."[14] But these statements clearly are not unequivocal promises that no changes would be made. The legislation was announced to be a revision as well as a codification. It is obvious that the changes in law retained in the Code were not considered as "controversial" by these Congressional spokesmen.

Petitioner does not offer any definition of "controversial," but he does point to one concrete example of what he regards as a "controversial" measure. This is the

---

[13] Hearings before House Committee on the Judiciary on H. R. 1600 and H. R. 2055, 80th Cong., 1st Sess. 6 (1947). He also testified as follows: ". . . we proceeded upon the hypothesis that since that was primarily a restatement of existing law, we should not endanger its accomplishment by the inclusion in the work of any highly controversial changes in law." And, in response to the Chairman's question, "And this bill does not include controversial matters?" Rep. Keogh replied that "We have sought to avoid as far as possible . . . any substantive changes that did not meet with unanimity of opinion." *Ibid.*, 11.

[14] 94 Cong. Rec. 7928 (1948). The Senator had just given an illustration of "various changes that have been made."

Jennings Bill,[15] which was under consideration in the House in the spring of 1947, as was the Code revision.[16] The Jennings Bill and § 1404 (a) of the Code meet the same problem, the alleged abuses in the selection. of

[15] H. R. 1639, 80th Cong., 1st Sess.: "A Bill To amend the Employers' Liability Act so as to limit venue . . . ." As ultimately reported to the House, it repealed all of § 6 of the Federal Employers' Liability Act, except the last sentence prohibiting removal of actions brought in state courts to federal courts; and added the following paragraph to the then general venue statute, § 51 of the Judicial Code, 28 U. S. C. § 112: "A civil suit for damages for wrongful death or personal injuries against any interstate common carrier by railroad may be brought only in a district court of the United States or in a State court of competent jurisdiction, in the district or county (parish), respectively, in which the cause of action arose, or where the person suffering death or injury resided at the time it arose: Provided, That if the defendant cannot be served with process issuing out of any of the courts aforementioned, then and only then, the action may be brought in a district court of the United States, or in a State court of competent jurisdiction, at any place where the defendant shall be doing business at the time of the institution of said action." H. R. Rep. No. 613, 80th Cong., 1st Sess., Pt. 1, 9–10 (1947).

[16] The House Committee on the Judiciary held hearings on the Code, before Subcommittee No. 1, on Mar. 7, 1947, and four hearings on the Jennings Bill, before Subcommittee No. 4, from Mar. 28 to April 18, 1947. Congressman Jennings himself was a member of Subcommittee No. 1, considering the Code. Congressman Devitt, a member of Subcommittee No. 4, considering the Jennings Bill, testified in favor of the Code; Hearings before House Committee on the Judiciary on H. R. 1600 and H. R. 2055 (Code), 80th Cong. 1st Sess. 3 (1947); Hearings before Senate Committee on the Judiciary on H. R. 3214 (Code), 80th Cong., 2d Sess. 16 (1948).

The unanimous Judiciary Committee Report favoring the Code was published in April, 1947. H. R. Rep. No. 308, 80th Cong., 1st Sess. The divided Report on the Jennings Bill was submitted in June. H. R. Rep. No. 613, 80th Cong., 1st Sess. (in three parts).

On July 7, 1947, the House passed the proposed revision by a vote of 342 to 23. 93 Cong. Rec. 8392. Ten days later, the Jennings Bill was passed by 203 to 188. 93 Cong. Rec. 9193–4.

forums for Liability Act suits.[17] But the Jennings Bill was far more drastic than § 1404 (a). The Jennings Bill would in large part have repealed § 6 of the Liability Act. It would have delimited the available forum for actions brought in state as well as federal courts.[18] It would have eliminated the right to sue in any district in which the railroad did business. Initially, this applied only to Federal Employers' Liability Act plaintiffs, but in final draft the Jennings Bill generally restricted all, including passengers, who might sue railroads for personal injuries. Inasmuch as none of these changes in the law was contained in the Code, it is evident that § 1404 (a) might well be considered "noncontroversial" by the same Congress which would regard the Jennings Bill as "controversial." [19]

---

[17] See, e. g., Hearings before House Committee on the Judiciary on H. R. 1639, 80th Cong., 1st Sess. 6–12, 17–22, 31–8 (1947); H. R. Rep. No. 613, 80th Cong., 1st Sess., Pt. 1, 3–6; Pt. 2, 1–2, 4 (1947).

[18] As one of its three grounds of opposition to the Jennings Bill, the minority Report stated, "The bill restricts State courts in the administration of justice, deprives them of their prerogatives to require change of venue of lawsuits where necessary, and transcends the provisions of State laws governing the jurisdiction of State courts." H. R. Rep. No. 613, 80th Cong., 1st Sess., Pt. 2, 1 (1947).

Doubt was expressed that Congress had constitutional power so to affect state courts. See, e. g., letter of Acting The Assistant to the Attorney General, Hearings before Senate Committee on the Judiciary on S. 1567 and H. R. 1639 (Jennings Bill), 80th Cong., 2d Sess. 215 (1948).

[19] Furthermore, petitioner's argument suggests at most that § 1404 (a) was as "controversial" as the Jennings Bill, as of July, 1947. Thereafter, however, both the Code and the Jennings Bill were referred to the Senate Judiciary Committee, which held hearings on both. The same three Senators composed the Subcommittee holding these hearings: Sen. E. H. Moore, Chairman at the hearings on the Jennings Bill in January, 1948; Sen. Donnell, Chairman at the hearings on the Code in April and June, 1948; and Sen. McGrath. The relationship between the two proposals was ex-

Moreover, even if we could distill from the legislative history of the Jennings Bill a usable concept of "controversial change," its application would destroy petitioner's case. For petitioner concedes that in fact § 1404 (a) did not arouse controversy; he submits the Jennings Bill as contrast. His argument is obviously based not on the actual legislative history of § 1404 (a), but on necessarily vague speculation as to what Congress might have done had it fully realized that *forum non conveniens* was henceforth to be applicable in Federal Employers' Liability Act suits. The requisite assumption, that Congress did not appreciate the significance of its action when it ratified the Code and § 1404 (a) therein, is contrary to the facts shown by the legislative history which is of record. The lack of controversy reflected aware agreement and not the inertia of ignorance.

This was scarcely hasty, ill-considered legislation. To the contrary, it received close and prolonged study. Five years of Congressional attention supports the Code.[20] And from the start, Congress obtained the most eminent expert assistance available. The spadework was entrusted to two lawbook-publishing firms, the staffs of which had unique experience in statutory codification and revision.[21]

---

pressly called to their attention. See Hearings before Senate Committee on the Judiciary on S. 1567 and H. R. 1639 (Jennings Bill), 80th Cong., 2d Sess. 111–112 (1948). The Committee reported the Code favorably, albeit with amendments; but the Jennings Bill was not reported.

It is clear that only the Tax Court provisions were regarded by the Senate Committee as sufficiently "controversial" to be deleted. See S. Rep. No. 1559, 80th Cong., 2d Sess. 2 (1948); 94 Cong. Rec. 7927 (1948).

[20] June 28, 1943, Congress appropriated $100,000 "For preliminary work in connection with the preparation of a new edition of the United States Code, including the correction of errors . . . ." 57 Stat. 230.

[21] See H. R. Rep. No. 308, 80th Cong., 1st Sess. 2–3 (1947).

They formed an advisory committee, including distinguished judges and members of the bar, and obtained the services of special consultants.[22] Furthermore, an advisory committee was appointed by the Judicial Conference.[23] And to assist with matters relating to the jurisdiction of this Court, Chief Justice Stone appointed an advisory committee, consisting of himself and JUSTICES FRANKFURTER and DOUGLAS.[24]

That these experts assisted in drafting the Code does not mean that Congress blindly approved what outsiders did. This is demonstrated, for example, by the statement of Representative Robsion, Chairman of the House Judiciary Subcommittee, at the hearing conducted by his

---

[22] "This public-spirited group [the advisory committee]' consisted of Judge Floyd E. Thompson, former chief justice of the Illinois Supreme Court and former president of the Chicago Bar Association; Hon. Justin Miller, former associate justice of the United States Court of Appeals for the District of Columbia; Judge John B. Sanborn, judge of the United States Circuit Court of Appeals for the Eighth Circuit; Hon. Walter P. Armstrong, of the Memphis bar and former president of the American Bar Association; and Hon. John Dickinson, of the Philadelphia bar, former assistant Attorney General of the United States.

"This advisory committee was ably assisted by Judge John J. Parker, senior circuit judge of the United States Circuit Court of Appeals for the fourth circuit, who rendered valuable service as a judicial consultant. The committee was also assisted by two special consultants each an expert in the field of Federal procedure: Judge Alexander Holtzoff, United States district judge, District Court for the District of Columbia; and Prof. James W. Moore, of Yale University." H. R. Rep. No. 308, 80th Cong., 1st Sess. 3 (1947). See also Hearings before House Committee on the Judiciary on H. R. 1600 and H. R. 2055, 80th Cong., 1st Sess. 7–8, 12–14, 17–18, 24–26 (1947).

[23] Circuit Judge Maris was Chairman, and District Judges Galston and W. F. Smith also served on the committee. Loc. cit. supra, note 22. See 1944 Report of the Judicial Conference 24; 1945 id. 17–18; 1948 id. 41.

[24] H. R. Rep. No. 308, 80th Cong., 1st Sess. 4 (1947).

Subcommittee in 1947. "We shall do the same as we did last year . . . just read them line by line and have you and other expert codifiers and other persons go over the bill with us." [25]

Petitioner almost seems to imply that this very careful Committee consideration vitiates the legislation. But the Committee system is integral in typical legislative procedure; Congress could not function without it.[26] A canon of construction which would discount statutory words *pro tanto,* the greater the expertise or the more meticulous the Committee consideration devoted thereto, or the longer and more complex the legislation, would be absurd, not least because it would make mockery of the techniques of statutory interpretation which have heretofore been used by the courts.

The experts and the Committees did not attempt to conceal the proposed revisions. "The committee on revision of the laws in the preparation of those preliminary

---

[25] Hearings before House Committee on the Judiciary on H. R. 1600 and H. R. 2055, 80th Cong., 1st Sess. 23 (1947).

[26] "Congressional government is Committee government . . . . The House sits, not for serious discussion, but to sanction the conclusions of its Committees as rapidly as possible. It legislates in its committee-rooms; not by the determinations of majorities, but by the resolutions of specially-commissioned minorities; so that it is not far from the truth to say that Congress in session is Congress on public exhibition, whilst Congress in its committee-rooms is Congress at work." Woodrow Wilson, Congressional Government, pp. xvi, 79 (15th ed. 1900). Nor has this changed. "The committees are the workshops of Congress. Committee work is the core of the legislative process. . . . It is the center of legislative activity where the law-making and supervisory functions of Congress are largely performed." Galloway, Congress at the Crossroads 53 (1946). And see Bryce, The American Commonwealth c. XV (New Ed. 1931); Chamberlain, Legislative Processes, cc. V–VI (1936); Kefauver and Levin, A Twentieth-Century Congress 114–153 (1947); Luce, Legislative Procedure, cc. IV–VIII (1922); Walker, The Legislative Process, c. 11 (1948).

drafts, sought to give them the widest possible circulation. We made certain that every member of the legislature got one; we made certain that they were sent to every United States attorney; that they were sent to every member of the Federal judiciary; that they were sent to the appropriate committees of the leading State and local bar associations; that they were sent to everyone who ever evidenced any interest in the work at all."[27] Indicative of the success in publicizing the provisions of the Code is the fact that there was specific treatment of § 1404 (a) and its applicability to Federal Employers' Liability Act suits in a number of legal periodicals.[28]

The initial appearance of § 1404 (a) was in the Second Draft of the Code, adopted by the meeting of May, 1945. Its text has remained unchanged. It was accompanied by a reviser's note, which recited that "Subsection (a) is new. It was drafted in accordance with a memorandum of Mar. 7, 1945, from the author of Moore's Federal Practice, stating that recognition should be given the doc-

---

[27] Hearings before House Committee on the Judiciary on H. R. 1600 and H. R. 2055, 80th Cong., 1st Sess. 8 (1947).

[28] Expressly reciting the reference to the *Kepner* case in the reviser's notes: Braucher, *The Inconvenient Federal Forum*, 60 Harv. L. Rev. 908, 933 (July, 1947); Note, *New Limitations on Choice of Federal Forum*, 15 U. of Chi. L. Rev. 332, 341, n. 54 (Winter [March], 1948); Comment, *Forum Non Conveniens, A New Federal Doctrine*, 56 Yale L. J. 1234, 1249, n. 115 (Aug., 1947). And see Barrett, *The Doctrine of Forum Non Conveniens*, 35 Calif. L. Rev. 380, 421 (Sept., 1947); Note, 32 Minn. L. Rev. 633, 636, n. 29 (May, 1948). Cf. Note, 23 Ind. L. J. 82, 87, n. 26 (Oct., 1947) (quoting § 1404 (a) but not referring to the reviser's notes).

Of course the fact that the Judicial Code was being revised was publicized in discussions not directly bearing on the instant issue; *e. g.*, Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code*, 13 Law & Contemp. Prob. 216 (1948); Zinn, *Revision of Federal Judicial Code*, 48 Law Notes, Nos. 3–4, 11 (1944) (earliest reference); Note, *The Proposed Revision of the Federal Judicial Code*, 60 Harv. L. Rev. 424 (1947).

trine of *forum non conveniens* . . . ." [29] The balance of that note was substantially the same as the present reviser's note; it expressly cited the *Kepner* case, an action under the Federal Employers' Liability Act, as demonstrating the need for § 1404 (a). *And the reviser's notes were before the Congress at every subsequent legislative step.*

A preliminary draft of the Code was printed late in 1945 for the use of the House Committee on Revision of the Laws. In this draft, the reviser's notes appear directly below each related section or subsection. Section 1404 (a) and its note were in this draft, which, as noted above, was given very wide circulation.

July 24, 1946, the House ordered to be printed the Report submitted by Representative Keogh of New York, Chairman of the House Committee on Revision of the Laws, on the codification of Title 28.[30] This Report consisted of a preliminary statement *and a full printing of the reviser's notes.* Section 1404 (a) appears in that Report, together with its note. There was no further action on the Code in the Seventy-Ninth Congress.

In the Eightieth Congress, under the Legislative Reorganization Act of 1946,[31] the Code revision passed to

---

[29] There is no doubt as to the meaning of § 1404 (a) in the mind of the author of the memorandum. See 3 Moore's Federal Practice 2141 (2d ed. 1948), stating that the Code "provides for a transfer . . . of *any* action to a proper and more convenient forum" (italics in original), with a footnote (107) citing § 1404 (a) and declaring that "ANY action in § 1404 (a) includes suits subject to special venue statutes, as suits for patent infringement and suits under the Federal Employers' Liability Act, as well as actions subject to the general venue statute." And see articles by a member of the advisory committee appointed by the Judicial Conference, and by the Chief Reviser: Galston, *An Introduction to the New Federal Judicial Code,* 8 F. R. D. 201, 206 (1948); Barron, *The Judicial Code 1948 Revision,* 8 F. R. D. 439, 442 (1949).

[30] H. R. Rep. No. 2646, 79th Cong., 2d Sess. (1946).

[31] 60 Stat. 812, 826–27 (1946).

the jurisdiction of the House Judiciary Committee and was assigned to a Subcommittee of which Representative Robsion of Kentucky was Chairman. At the hearing before this Subcommittee, Professor James William Moore of Yale University, special consultant to the revisers, in summarizing the Code proposals, testified that there were "changes of importance" in the law of venue and specifically mentioned § 1404.[32] In April, 1947, the House Judiciary Committee reported the bill with a unanimous recommendation that it be passed.[33] This Report *again fully reprinted the reviser's notes.* In this Report, the section entitled "Examples of Changes in Law," which had appeared in the Report on the revision in the preceding Session of Congress, expressly referred to the reviser's notes for §§ 1391–1406.[34]

After this painstaking consideration, with its references to § 1404 (a), the House initially passed the bill on July 7, 1947.[35] At that time and in the subsequent consideration in the Senate, the Tax Court provisions occasioned the most discussion; but other specific sections did not pass unnoticed. Attention was directly called to § 1404 (a) by one witness at the hearings before the Senate Judiciary Subcommittee, although his interest was not in the Federal Employers' Liability Act issue.[36] No change in § 1404 (a) was included in the Senate amendments; and the revision of Title 28 was enacted by the Congress in June, 1948.[37]

[32] Hearings before House Committee on the Judiciary on H. R. 1600 and H. R. 2055, 80th Cong., 1st Sess. 29 (1947).

[33] H. R. Rep. No. 308, 80th Cong., 1st Sess. (1947).

[34] *Ibid.*, 6.

[35] 93 Cong. Rec. 8392 (1947).

[36] Hearings before Senate Committee on the Judiciary on H. R. 3214, 80th Cong., 2d Sess. 73–74 (1948).

[37] 94 Cong. Rec. 7927–30, 8297, 8438, 8498–8501 (1948).

While it lacks relevance to our holding as to Congressional intention and expression in June, 1948, the presentation of an up-to-date

Thus, at almost every stage of the legislative procedure, attention was directed to the fact of change, and in most instances specific mention was made of § 1404 (a). At no stage subsequent to the first formal printing did § 1404 (a) and its accompanying reviser's note fail to appear. From the start, § 1404 (a) remained the same, and the reference in the note to a Federal Employers' Liability Act case as showing the need for permitting the application of *forum non conveniens* remained unchanged. Now to hold that Congress did not appreciate what it was enacting in that section would defy the legislative history. We must flatly reject petitioner's thesis that this section was so obscured that its enactment is meaningless. We cannot blind ourselves to the hearings, to the experts, to the Committee reports, to the reviser's notes and their incorporation in the Committee reports—to a history of the most meticulous Congressional consideration.

*Fourth.* Petitioner suggests that his action may not be transferred because it was instituted prior to the effective date of the Code. Clearly, § 1404 (a) is a remedial provision applicable to pending actions. And "No one has a vested right in any given mode of procedure . . . ." *Crane* v. *Hahlo,* 258 U. S. 142, 147 (1922).[38]

---

report of Congressional consideration of the Code revision requires noting that over 60 additional amendments to Title 28 have already become law. Act of May 24, 1949, 63 Stat. 89, 99–107, §§ 64a–127. See 95 Cong. Rec. 3814–20, 5826–27, 6283–84; H. R. Rep. No. 352, 81st Cong., 1st Sess. 11–20, 38–51 (1949); S. Rep. No. 303, 81st Cong., 1st Sess. (1949). While § 1406 is amended by adding "shall dismiss, or if it be in the interest of justice" before "shall transfer" (63 Stat. 101, § 81), no change whatever was suggested or made in § 1404 (a).

[38] *Gwin* v. *United States,* 184 U. S. 669 (1902); *National Exchange Bank of Baltimore* v. *Peters,* 144 U. S. 570 (1892); *Sherman* v. *Grinnell,* 123 U. S. 679 (1887); *McBurney* v. *Carson,* 99 U. S. 567, 569 (1878).

*Fifth.* Since the petition for mandamus and prohibition must be denied because of the view we must take as to the meaning of § 1404 (a) and its applicability to this case, we need not decide whether denial might be placed on other grounds also. "Mandamus, prohibition and injunction against judges are drastic and extraordinary remedies. . . . As extraordinary remedies, they are reserved for really extraordinary causes." *Ex parte Fahey,* 332 U. S. 258, 259, 260 (1947).[39]

What we hold is that the plain meaning of the statutory words and the consistent course of the legislative history are opposed to petitioner's contention that we must disregard § 1404 (a) because Congress knew not what it did. If petitioner's showing could sustain a decision that this section was not really enacted after all, little law would remain.

The motion is

*Denied.,*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS dissent for the reasons stated in the dissenting opinion of MR. JUSTICE DOUGLAS in *United States v. National City Lines, post,* p. 84.

MR. JUSTICE RUTLEDGE.*

I concur in the result. But in doing so I feel impelled to say two things.

One is that in my view § 1404 (a), taken broadly to include "any civil action," does effect a partial repeal of

---

[39] *Ex parte Mars, Inc.,* 320 U. S. 710 (1943); *Roche* v. *Evaporated Milk Assn.,* 319 U. S. 21 (1943), and cases there cited. Cf. *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196 (1945), and cases there cited.

*[This is also a concurrence in the result in No. 233, Misc., *Kilpatrick* v. *Texas & P. R. Co., post,* p. 75, and No. 269, Misc., *United States* v. *National City Lines, post,* p. 78.]

§ 6 of the Federal Employers' Liability Act and of the other statutes mentioned by MR. JUSTICE DOUGLAS, including the venue provisions (§ 12) of the Clayton Act involved in our decision in *United States* v. *National City Lines,* 334 U. S. 573.

The legislative history, for example, of the Clayton Act venue provisions demonstrates that the change '§ 1404 (a) is said to have made was more than the mere removal of a judicial gloss. I think we should not now impugn the validity of our decisions in *National City Lines, supra,* and in *Kepner* and *Miles* [1] by characterizing each as a mere "judicial gloss" upon the pertinent statute. Those decisions in my opinion were true reflections of congressional intent as stated in the respective statutes and, accordingly, the changes made in them by § 1404 (a) were in the nature of repeals, to the extent that the plaintiffs were deprived of their rights under the pre-existing statutes to have their causes of action tried in the forums where they were properly brought.

In the second place, those changes, although entirely within Congress' power to make, were neither insubstantial nor noncontroversial, in view of the legislative history of the original provisions, for example, the venue provisions of the Clayton Act. Nor do I think the legislative history of § 1404 (a) demonstrates either the insubstantial or the noncontroversial nature of the changes in § 1404 (a), although they seem to have been so treated by those in charge of the bill.[2] It is to be noted, moreover, that

---

[1] *Baltimore & Ohio R. Co.* v. *Kepner,* 314 U. S. 44; *Miles* v. *Illinois Central R. Co.,* 315 U. S. 698.

[2] "At the same time great care has been exercised to make no changes in the existing law which would not meet with substantially unanimous approval." S. Rep. No. 1559, 80th Cong., 2d Sess. 2. ". . . I may say that the purpose of this bill is primarily to revise and codify and to enact into positive law, with such corrections as

specific attention was drawn to the effect of § 1404 (a) upon § 6 of the Employers' Liability Act through reference to the *Kepner* and *Miles* decisions, but no like specific reference was made to the venue provisions of the Clayton Act and the *National City Lines* decision.

These matters make it impossible for me to concur in the view that Congress was in fact "fully informed as to the significance of § 1404 (a)." This, however, is a matter affecting congressional procedure and the manner of conducting legislative business. Accordingly, notwithstanding my doubts that Congress intended to go so far, I acquiesce in the Court's decisions.

---

were deemed by the [Senate Judiciary] committee to be of substantial and noncontroversial nature." 94 Cong. Rec. 7928. For similar expressions by members of the House of Representatives, see Hearings before House Committee on the Judiciary on H. R. 1600 and H. R. 2055, 80th Cong., 1st Sess. 6, 11. A member of the House Judiciary Committee told the House that the only "controversial aspects" of the 1947 draft of the code were certain subsequently deleted provisions concerning the Tax Court. 93 Cong. Rec. 8390. But cf. the legislative history of the contemporaneously pending Jennings Bill, citations to which are made in the Court's opinion.