**GENERAL ELECTRIC COMPANY,**
Appellant,

v.

**SOUTHERN CONSTRUCTION COMPANY, Inc., et al., Appellees.**

No. 22294.

United States Court of Appeals
Fifth Circuit.

Aug. 28, 1967.

Rehearing Denied Oct. 16, 1967.

---

———◆———

Michael H. Bagot, Jesse S. Guillot, New Orleans, La., Cromwell Warner, Jr., Los Angeles, Cal., for appellant.

A. Morgan Brian, Jr., New Orleans, La., for appellees.

Before JONES and BELL, Circuit Judges, and BREWSTER, District Judge.

BREWSTER, District Judge:

This suit was brought under the Miller Act against a federal construction job prime contractor and its payment bond surety to recover for the benefit of a materialman an unpaid balance due by a defaulted subcontractor for electrical materials furnished for use in the project. The sole question involved is one of law: Does the one year limitation period set out in 40 U.S.C.A., Section 270b (b) begin to run against a materialman from the date of supplying the last material for use in the project, or from the date of supplying the last material *for which claim is made?* The trial court was of the opinion that the latter date applied, and denied recovery by a summary judgment upon the theory that the claim was barred by limitation. We disagree with that decision and reverse the judgment.

The facts were fully developed by admissions, affidavits and stipulations; and they are undisputed. They will be outlined only generally herein, as they are set out in detail in the opinions of the able trial judge reported in 229 F.Supp. 873 and 236 F.Supp. 742.

The United States entered into a contract on August 6, 1959, with Southern Construction Company, Inc. for the construction of a Nike-Hercules defense facility near Barksdale Air Force Base in Louisiana. Continental Casualty Company was the surety on the statutory payment and performance bonds furnished by Southern in compliance with the obligations imposed on it as prime contractor under the Miller Act.

Southern subcontracted all electrical work on the project to Mojave Electric Company by written contract dated September 22, 1959. Mojave performed its work until it went broke and defaulted in March, 1960. Southern took over the electrical work for a short period until it entered into a subcontract with Evans-Jones Electric, Inc. on April 12, 1960, for completion of the work Mojave had agreed to do. General Electric Company, the use plaintiff in this suit, supplied the electrical material for the project during all stages of the electrical work. A mistake in bookkeeping during the changeovers from Mojave to Southern to Evans-Jones gave rise to the question that we are called upon to decide.

The electrical materials General Electric furnished to Mojave for use in the project were carried on open account. All the invoices to Mojave covering those materials are dated consecutively throughout November and December, 1959, and January, February and part of March, 1960. The last invoice listed on Mojave's account with General Electric is numbered 5010, and is dated March 14, 1960. It shows the sale of twelve cast iron boxes and some incidentals for $1,977.74. The materials covered by invoice #5010 reached the jobsite in two deliveries, one on March 21, and the other on March 30, 1960. They were the only materials General Electric delivered to the jobsite for Mojave later than March 13, 1960. It was during the time those materials were in transit that Mojave

suffered the financial collapse and abandoned its subcontract with Southern. Aside from a credit adjustment shown on the account, Mojave never made any payment to General Electric for materials furnished it for the project.

When General Electric learned of Mojave's default, it acted promptly to protect itself under the Miller Act. On March 15, 1960, it sent registered letters to Southern and to Continental, enclosing a formal notice of claim and an itemized statement of the Mojave account showing a balance due of $11,369.39. Invoice #5010 was the last item shown on the account. The form and the timeliness of the notices are not questioned.

Shortly after Mojave's default, it was arranged between Southern and General Electric for a new account to be opened directly with Southern so that critical electrical materials already on order could be promptly received on the job while Southern was winding up details for a new subcontractor to take over and complete the work Mojave had abandoned.

The subcontract dated April 12, 1960, between Southern and Evans-Jones for completion of the electrical work on the job, expressly provided that Evans-Jones pick up on its own account and pay for General Electric's invoice #5010. General Electric received prompt notice of that agreement, and wrote a letter on April 18, 1960 consenting thereto. Evans-Jones made a payment to General Electric on May 31, 1960, which completely covered invoice #5010 and other items not material here.

Although invoice #5010 was changed to the Evans-Jones account on the books of General Electric around the middle of April, 1960, General Electric inadvertently failed to remove it from the itemized statutory claim against Southern and Continental, and continued to carry it as the last item on its statement of the unpaid Mojave account.

During the period from April to September, 1960, Evans-Jones continued to receive materials from General Electric for use in the job. The materials were carried by General Electric on the Evans-Jones account, and were paid for in due course.

The present action was filed on March 13, 1961. The $11,369.39 claimed to be due General Electric on the Mojave account included the materials listed on invoice #5010. General Electric's motion for summary judgment, filed on September 6, 1962, still sought to recover on the account listing invoice #5010 as the last item. On February 21, 1963, General Electric filed corrective affidavits in support of its motion for summary judgment revealing for the first time its mistaken belief that the #5010 invoice had not been paid. The affidavits disclosed further that the amount of its unpaid balance was the same, even after the elimination of invoice #5010, because a different invoice for materials furnished Mojave for the job prior to March 13, 1960, in an amount identical to that on #5010, had been inadvertently omitted from the statutory claim.

40 U.S.C.A. Section 270b(b),[1] the limitation statute here involved, provides

---

1. 40 U.S.C.A. Section 270b reads in its entirety:
   "270b. Same; rights of persons furnishing labor or material
   "(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall

have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him; *Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or per-

that no suit by a person who has furnished labor or material for a project covered by the Miller Act "shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by him." The trial court resorted to canons of construction to determine the meaning of the statute, and, after considering its legislative history and construing the statute in *pari materia* with Section 270b (a), concluded that the words "for which claim is made", should be read into Section 270b(b) to carry out the true congressional intent. We differ with that decision for the reasons that follow.

As we view Section 270b(b), there is nothing ambiguous or doubtful about the language, "after the expiration of one year after the day on which the last of the labor was performed or material was supplied" by the claimant. There is, therefore, no occasion to resort to the legislative history of the statute,[2] or to the rule of construction in *pari materia*.[3] The court must give effect to the plain and obvious meaning of the statute without reading in or reading out.[4] When that is done, we conclude that this suit, brought within the one year period following the day on which the last material was furnished, was timely filed. This

formed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Such notice shall be served by mailing the same by registered mail, postage prepaid, in an envelope addressed to the contractor at any place he maintains an office or conducts his business, or his residence, or in any manner in which the United States marshal of the district in which the public improvement is situated is authorized by law to serve summons.

"(b) Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit, but no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by him. The United States shall not be liable for the payment of any costs or expenses of any such suit. As amended Aug. 4, 1959, Pub.L. 86–135, § 1, 73 Stat. 279."

2. Ex parte Collett, 337 U.S. 55, 61, 69 S. Ct. 944, 93 L.Ed. 1207, 1211, 10 A.L.R. 2d 921; United States v. Public Utilities Commission, 345 U.S. 295, 314, 73 S. Ct. 706, 97 L.Ed. 1020, 1037. The *Collett* case says at p. 61 of 337 U.S., at p. 947 of 69 S.Ct., and at p. 1211 of 83 L. Ed.: "Petitioner's chief argument proceeds not from one side or the other of the literal boundaries of § 1404(a), but from its legislative history. The short answer is that there is no need to refer to the

legislative history where the statutory language is clear. The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.' Gemsco, Inc. v. Walling, 1945, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921, 933. This canon of construction has received consistent adherence in our decisions."

3. "* * * (T)he rule of *pari materia* is resorted to only in cases where the meaning of a statute is ambiguous or doubtful. * * *" Northern Pacific Ry. Co. v. United States, 7 Cir., 156 F.2d 346, 350 (1946), affirmed, 330 U.S. 248, 67 S.Ct. 747, 91 L.Ed. 876.

4. We do not mean to imply that our interpretation of Subdivision (b) would be different if it were construed in the light of its legislative history and in *pari materia* with Subdivision (a). A discussion of the legislative history would unduly lengthen this opinion; but suffice it to say that such history shows that Subdivision (b), as it now stands, and as it read from the time of its passage in 1938 until it was changed to its present form by amendment of August 4, 1959, has always had a different purpose from Subdivision (a). If we were to consider the two subdivisions in *pari materia*, we would apply the rule that in the absence of a clear intent to the contrary, "(W)here a statute with respect to one subject contains a given provision, the omission of such provision from a similar statute is significant to show a different intention existed. * * *" 82 C.J.S. Statutes § 306a p. 813. City of Port Hueneme v. City of Oxnard, 52 Cal. 2d 385, 341 P.2d 318; State v. Welkos, 14 Wis.2d 186. 109 N.W.2d 889.

conclusion is consistent with the overall remedial purpose of the Miller Act to provide broad protection for persons supplying labor and material for the construction of federal public projects.[5]

The judgment is reversed and the case is remanded with instructions to enter summary judgment in favor of General Electric.

---

5. Standard Accident Ins. Co. v. United States, 302 U.S. 442, 444, 58 S.Ct. 314, 82 L.Ed. 350, 351.

We cannot believe that Congress intended Section 270b(b) to be inconsistent with the remedial purpose of the Miller Act recognized in the above cited case and in many others following it. If the construction of Subdivision (b) contended for by appellees were accepted, the prime contractor or his bonding company could set the date in many cases for the beginning of the one year limitation period by paying the charges for the last labor or material furnished. If the balance of the claim were based on labor performed or materials furnished more than a year before the payment, it would be barred by the one year limitation period.