**AMERICAN TELEPHONE AND TELE-GRAPH COMPANY, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COM-MISSION and the United States of America, Respondents,**

**Data Transmission Company et al., Intervenors.**

**No. 616, Docket 73-1758.**

United States Court of Appeals, Second Circuit.

Argued June 4, 1974.

Decided Sept. 23, 1974.

Alfred Partoll, New York City (Michael Boudin, Hugh B. Cox, Robert H. Loeffler, Washington, D. C., C. Duane Aldrich, Marian Jean Dabney, New York City, on the brief, F. Mark Garling-house, Harold J. Cohen, New York City, of counsel), for petitioner.

Joseph A. Marino, Associate Gen. Counsel, Federal Communications Commission, Washington, D. C. (John W.

---

12. Insofar as *Palmer*, 479 F.2d 153 (6th Cir. 1973), is inconsistent herewith, it is modified.

Pettit, Gen. Counsel, Philip V. Permut, Counsel, Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C.), for respondents.

William J. Byrnes, Washington, D. C. (Haley, Bader & Potts, Washington, D. C., Michael H. Bader, Kenneth A. Cox, Washington, D. C., on the brief), for intervenors Microwave Communications, Inc. & MCI Telecommunications Corp.

Glaser & Fletcher, Michael L. Glaser, Francis E. Fletcher, Jr., Washington, D. C., John M. Scorce, Vienna, Va., of counsel, for intervenor Data Transmission Co.

McKenna, Wilkinson & Kittner, Joseph M. Kittner, Edward P. Taptich, Norman P. Leventhal, Washington, D. C., Howrey, Simon, Baker & Murchison, John S. Voorhees, Washington, D. C., on the brief, for intervenor Computer & Business Equip. Mfrs. Ass'n.

Before KAUFMAN, Chief Judge, and MULLIGAN and TIMBERS, Circuit Judges.

MULLIGAN, Circuit Judge:

■ This is a petition by the American Telephone & Telegraph Company (AT&T) for review [1] of a portion of a Federal Communications Commission (FCC) order, 25 F.C.C.2d 957 (1970), reconsideration denied, 40 F.C.C.2d 149 (1973), in which the FCC adopted Rule 61.58, now codified at 47 C.F.R. § 61.58 (1973),[2] which revises the procedures that govern the filing of interstate tariffs by communications common carriers. The sole question raised by the petition is whether Section 203(b) of the Communications Act of 1934, 47 U.S.C. § 203(b),[3] which gives the FCC the power in its discretion and for good cause shown to "modify" its requirements, permits a rule revision which enlarges from 30 days to 60 days the required notice period for common carriers filing rate increases. The petitioner urges·that the FCC statutory power to "modify" its requirements must be construed to mean that the Commission has only the authority to shorten, but not to extend the public notice requirement. We are persuaded that the word

1. Several carriers were granted permission by this court to intervene in this proceeding and have filed briefs: Data Transmission Co., Microwave Communications, Inc. and MCI Telecommunications Corp., as well as Computer & Business Equip. Mfrs. Ass'n., a trade association representing the computer and business equipment industry. All have argued in support of the FCC regulation.

2. 47 C.F.R. § 61.58 (1973) provides:
Every tariff publication which constitutes a rate increase shall bear an effective date and, except as otherwise provided by regulation, special permission, or order of the Commission, shall give not less than 60 days notice to the public and to the Commission. Notice shall be given by filing with the Commission such proposed tariff publications. In addition to this notice, if the tariff publication proposes to increase any charge or to effectuate an authorized discontinuance, reduction or other impairment of service to any customer, the filing carrier shall take such steps as are appropriate under the circumstances to inform the affected customers of the content of the tariff publication. Every tariff publication which does not constitute a rate in-

crease shall bear an effective date and, except as otherwise provided by regulation, special permission, or order of the Commission, shall give not less than 30 days notice to the public and to the Commission regardless of whether or not changes are effected thereby. Any period of notice required herein shall begin on and shall include the date the tariff is received by the Commission, but shall not include the effective date. In computing the notice required, Sundays and holidays shall be counted.

3. 47 U.S.C. § 203(b) provides:
No change shall be made in the charges, classifications, regulations, or practices which have been so filed and published except after thirty days' notice to the Commission and to the public, which shall be published in such form and contain such information as the Commission may by regulations prescribe; but the Commission may, in its discretion and for good cause shown, modify the requirements made by or under authority of this section in particular instances or by a general order applicable to special circumstances or conditions.

"modify" used in the statute plainly gives the FCC the power to alter or change the notice period whether it results in an increase or decrease of time involved. The petition for review is therefore denied.

## I

Where the FCC has not prescribed a rate, carriers initiate rate changes by filing a tariff with the Commission. Because of the notice provision of Section 203(b), the tariff normally goes into effect 30 days after the filing. The waiting period is designed to give the public the opportunity to review the tariff and to make any pertinent comments. It is further intended to provide the FCC time to study the tariff as well as any comments received from the public. The FCC may reject the tariff, 47 U.S.C. § 203(a), or suspend it and order an investigation of the proposed rates, 47 U.S.C. § 204. The suspension period however, may not exceed 3 months. If the FCC has not completed its investigation within that time, then the rate becomes effective by operation of law. If the rate is subsequently found to be un-lawful, the carrier is obligated to refund excess charges. 47 U.S.C. § 204.

By 1969, the FCC was aware of the fact that the notice provisions furnished inadequate time either for public or Commission evaluation. Under the then Commission rules, 47 C.F.R. § 1.773 (1969),[4] the public was requested to file its comments within 16 days of the filing of the proposed tariff which gave the FCC only 14 days to evaluate the public comment and even less time to consider the carrier's response. Moreover, tariff filings had become increasingly more complex and difficult to assess.

On October 17, 1969, the FCC initiated rule-making procedures seeking to amend its regulations to require carriers to provide more specific data with their tariffs, to provide actual notice of tariff filings to the public (previously, copies of the tariffs were simply posted in areas where the carrier operated) and to extend the 30-day notice period to 60 days. Notice of Proposed Rule Making, 34 Fed.Reg. 17116. The petitioner and other carriers objected. The Commission, on October 13, 1970, released its Final

4. 47 C.F.R. § 1.773 (1969) provided:

(a) *Content.* A petition for suspension of a new tariff schedule or any provision thereof shall indicate the schedule affected by its Federal Communications Commission number and give specific reference to the items against which protest is made, together with a statement indicating in what respects the protested tariff schedule is considered unlawful. No petition shall include a prayer that it also be considered a formal complaint. Any such formal complaint shall be filed as a separate pleading as provided in § 1.721.

(b) *When filed.* A petition for suspension shall be filed with the Commission and served upon the publishing carrier and the Chief, Common Carrier Bureau at least 14 days before the effective date of the tariff schedule. In case of emergency and within the time limits herein provided, a telegraphic request for suspension may be sent to the Commission setting forth succinctly the substance of the matters required by paragraph (a) of this section. A copy of any such telegraphic request shall be sent simultaneously to the pub-lishing carrier and the Chief, Common Carrier Bureau and forthwith confirmed by petition filed and served in accordance with this section.

(c) *Reply.* A publishing carrier may reply to a petition for suspension, but any such reply shall be filed with the Commission and served simultaneously upon petitioner and the Chief, Common Carrier Bureau within 3 days after service of the petition for suspension.

(d) *Copies; service.* An original and 14 copies of each petition or reply must be filed with the Commission, and served in accordance with paragraphs (b) and (c) of this section.

In view of the adoption of the new Rule 61.58, subdivision (b) of the above regulation was modified to provide the public with greater time (25 days) to evaluate carrier tariff filings which increase rates and also to enlarge the period during which the FCC may study the proposed rates and public comments (35 days) as well as carrier replies (32 days), 40 F.C.C.2d 149 (1973). The modified provision is codified at 47 C.F.R. § 1.773 (1973).

Report and Order, 25 F.C.C.2d 957, adopting in substance the regulations proposed in its Notice. AT&T petitioned for reconsideration and the FCC denied the petition in a Memorandum Opinion and Order released on March 27, 1973, 40 F.C.C.2d 149. This petition for judicial review followed and it is limited to the sole question of the statutory power of the FCC (not the wisdom of its policy) to extend the 30-day notice provision to 60 days.

## II

As we noted initially, Section 203(b) clearly provides that the FCC has the power to "modify" the notice requirement. AT&T concedes this but argues that the word "modify" can only mean reduce and cannot be interpreted to mean enlarge. The FCC and the intervenors urge that to modify means to change or to alter whether or not this results in an increase or decrease in the notice period. Each party and the intervenors have supplied etymological support for their positions.[5] AT&T even resorts to the philological ultimate, the Latin root, *modificare*, in which it finds particular comfort. Before succumbing to semantic aphasia, we are persuaded that to "modify" means to alter or to change whether this involves enlargement or reduction. Black's Law Dictionary 1155 (4th ed. 1951) so defines the word and this is the normal meaning which lawyers and judges attribute to the term.[6] Certainly, to modify an opinion or an order, is not necessarily to reduce it but simply to change it, irrespective of any quantitative result.

The petitioner's interpretation, in any event, actually supports and does not contradict the position we take. In its brief, AT&T argues that the term "modify" is often employed in statutes to empower an agency to relax its requirements: "This use of 'modify'—as a synonym for relaxation—is one of the most familiar of the dictionary meanings of the term. *Cf.* American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539 [, 90 S.Ct. 1288, 25 L.Ed.2d 547] (1970)." Brief for AT&T at 12. The case referred to does not involve any statutory construction problem concerning the word "modify," but simply refers to the *ad hoc* power of an agency to relax its procedural rules when required by justice. The language relied upon in the Supreme Court decision is excerpted from NLRB v. Monsanto Chem. Co., 205 F.2d 763, 764 (8th Cir. 1953). In the *Monsanto* case, the court upheld a National Labor Relations Board order despite the claim that the application for a review of an order of the Board's Regional Director had been filed six days after the time fixed by the Board's rule. The court held that the agency had the power "to relax or modify its procedural rules." As we have indicated, the *American Farm Lines* case is hardly in point here where the power to modify the time requirement is explicitly provided in the statute. However, it is significant that the modification found permissible in *Monsanto* actually involved an enlargement of the time to file. Thus, even assuming that AT&T is correct in its position that to modify means to relax, to reduce or to temper, the change effectuated here does just that. By

---

5. Our attention has been directed to: Black's Law Dictionary (4th ed. 1951); Oxford English Dictionary (compact unabr. ed. 1971); Random House Dictionary of the English Language (unabr. ed. 1966); Webster, Third International Unabridged Dictionary (1961); Webster, Second International Unabridged Dictionary (1934).

6. See generally Wagner v. Shapona, 123 Cal. App.2d 451, 267 P.2d 378, 383 (1954); Ex parte Marcus, 11 Cal.App.2d 359, 53 P.2d 1021, 1022 (1936); Johnson v. Three Bays Properties # 2, Inc., 159 So.2d 924, 926 (Fla.Dist.Ct.App.1964); McGoldrick Lumber Co. v. Benewah County, 54 Idaho 704, 35 P.2d 659, 662 (1934); Morris v. The Broadview, Inc., 328 Ill.App. 267, 65 N.E.2d 605, 608 (1946); Jarman v. Collins-Hill Lumber & Coal Co., 226 Iowa 1247, 286 N.W. 526, 528 (1939); In re Independent Consolidated School Dist. No. 16, 241 Minn. 454, 63 N.W.2d 543, 545–546 (1954).

increasing the notice period from 30 days to 60 days, the Commission is providing more time for the public to file objections to, and for itself to evaluate, new tariffs. It is thus easing the strictures of the present rule; it is relaxing its requirements just as the NLRB did in *Monsanto*. In sum, an extension of time may well constitute a reduction or easing of the requirements of the regulation. While this is obviously not in the economic interest of the petitioner, the prime responsibility of the agency is to the public and not to the protected monopolist. See GTE Serv. Corp. v. FCC, 474 F.2d 724, 730–732 (2d Cir. 1973).

■ We conclude, therefore, that the plain meaning of the word "modify" in the statute, no matter what thesaurus is consulted, permits the Commission to extend the notice period from 30 to 60 days as it has done in Rule 61.58.

### III

AT&T argues further that the legislative history of Section 203(b) establishes that the Commission is not authorized to enlarge the notice requirement. In view of what has already been said here, there is no justification to resort to legislative history since the language of the statute is not ambiguous. The cases so holding are legion and we need cite only a few. Ex parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949); United States v. Blasius, 397 F.2d 203, 205–206 (2d Cir. 1968), petition for cert. dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969); Wirtz v. Teamsters Local 191, 321 F.2d 445, 448 (2d Cir. 1963).

In any event, the history relied upon, if anything, bolsters the position we have adopted. The contention of AT&T is that in drafting the Communications Act of 1934, the first comprehensive regulatory plan for telecommunications common carriers offering interstate service, Congress drew on the considerable body of experience gained in framing and amending the Interstate Commerce Act. There is no gainsaying the proposition. However, it is equally clear that the congressional intent was not to provide a carbon copy of the Interstate Commerce Act. The House Report, H.R. No. 1850, 73 Cong., 2d Sess. 4 (1934), states, for example:

> While a series of minor amendments have followed this 1910 legislation [Interstate Commerce Act], the act never has been perfected to encompass adequate regulation of communications, but has really been an adaptation of railroad regulation to the communications field. As a consequence, there are many inconsistencies in the terms of the act and also many important gaps which hinder effective regulation. In this bill the attempt has been made to preserve the value of court and Commission interpretation of that Act, *but at the same time modifying the provisions so as to provide adequately for the regulation of communications common carriers.* (emphasis added).

AT&T argues that the Congress, in enacting the Communications Act, intended to borrow the counterpart filing provisions of the Interstate Commerce Act and that Section 203(b) was taken from Section 6 of that statute, Pub.L. No. 337, 34 Stat. 586 (1906), codified as amended at 49 U.S.C. § 6(3). However, when the Communications Act was passed in 1934, 49 U.S.C. § 6(3) provided in pertinent part:

> No change shall be made in the rates, fares, and charges . . . which have been filed . . . , except after thirty days' notice to the Commission and to the public . . . Provided, That the Commission may, in its discretion and for good cause shown, *allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs,* either in particular instances or by general order applicable to special or peculiar circumstances or conditions. (emphasis added).

It seems clear that the Congress did not copy Section 203(b) from 49 U.S.C. § 6(3) since the latter explicitly and unambiguously provided that the 30-day period could only be lessened. It is significant that where Congress intended that an agency have the power to modify the 30-day notice period only by decreasing the period, it found clear and unambiguous language to express that power.[7]

In light of the congressional ability, before and after the 1934 Communications Act, to express with precision its intention that a regulatory agency have the power only to curtail and not to enlarge the tariff notice period, the use of the word "modify", rather than the usual "allow changes upon less than the notice [of thirty days] herein specified," takes on additional significance. It cannot be dismissed as· a minor stylistic variation in phrasing, as AT&T argues. As we have already indicated, the language of Section 203(b) is clear and, in the words of Senator Dill, who introduced and managed the Senate Bill, "from a drafting standpoint, . . . it is a very carefully prepared bill." 78 Cong.Rec. 8872 (1934). We can only conclude that the plain language employed was intended to mean what it says. The legislative history in no place at all indicates any intent to give the FCC only the power to reduce the notice period. In view of the comparable sections of the other agency provisions, we are convinced that the interpretation of the FCC and of all of the intervenors is sound.

In its reply brief, AT&T takes the position that our decision in American Tel. & Tel. Co. v. FCC, 487 F.2d 865 (2 Cir. 1973) is controlling and mandates the conclusion that Section 203(b) confers no greater power on the FCC than was granted to the ICC and FPC under statutes administered by them. This is simply not so. The issue before us there was the validity of an FCC requirement that AT&T obtain "special permission" from the Commission as a precondition to the filing of tariff changes. We held that the Commission had no such inherent power and we found nothing in Section 203(b) to justify such procedure. The "special permission" procedure there improvised by the FCC was in no fashion authorized by the Communications Act and it did constitute a device which disrupted the statutory scheme of carrier initiated rate changes. It was in effect a rate "prescription" and inconsistent with 47 U.S.C. § 205, which authorizes rate prescriptions only after a full hearing and specific findings.

The language in our opinion primarily relied upon by AT&T to support its position is:

It is clear from the legislative history that Section 203(b) conferred no greater power *in this respect* upon the FCC than was granted to the ICC and the FPC under the statutes administered by them.

487 F.2d at 879 (emphasis added). The interpretation of our opinion urged upon us ignores the phrase which we have emphasized which makes it clear that Judge Timbers was referring specifically to the special permission gimmickry introduced by the FCC without authorization express or implied in Section 203(b). His later language makes this quite clear when he wrote:

In short, under Section 203(b) the Commission may only modify requirements as to the form of, and information contained in, tariffs and the *thirty days notice provision.*

487 F.2d at 879 (emphasis added). ·

7. See Intercoastal Shipping Act of 1933, Pub.L. No. 415, § 2, 47 Stat. 1425–1426 (codified as amended at 46 U.S.C. § 844); Public Utility Act of 1935, Pub.L. No. 333, § 205(d), 49 Stat. 851–852 (codified at 16 U. S.C. § 824d(d)); Natural Gas Act, Pub.L. No. 688, § 4(d), 52 Stat. 823 (1938) (codified at 15 U.S.C. § 717c(d)); Civil Aeronautics Act of 1938, Pub.L. No. 706, § 403(c), 52 Stat. 993 (repealed 1958); Federal Aviation Act of 1958, Pub.L. No. 85–726, § 403(c), 72 Stat. 759 (codified at 49 U.S.C. § 1373(c)).

In sum, then, we see nothing in the holding and, upon analysis, nothing in the words carefully selected by our brother Timbers which warrants the elation which our opinion generates in AT&T. In fact, we said what the statute says itself—that the FCC can modify the time requirement in the notice provision. Whether such modification could take the form of an increase or a decrease in time was not before us then. It is now and it can.

### IV

The final argument of AT&T is like unto its first and, if anything, is even less persuasive. We are urged that if the Commission has the power to extend the notice period from 30 to 60 days, it undermines the present careful and comprehensive statutory rate changing provisions of the Act, to wit, a 30-day advance notice period plus a maximum 3-month subsequent suspension period. Extending the period, AT&T argues, involves irreparable harm since the revenue represented by the new tariff can never be recouped.

The fact that the Congress has provided a comprehensive and careful statutory plan for rate increases cannot and will not be denied here. However, the suggestion that the congressional scheme represents a plan with an immutable time table is frivolous. As we have already noted, the Congress itself specifically provided that the notice time for rate changes could be modified. AT&T argues strenuously that the time can be shortened, which is itself an admission that the time element was intended to be flexible. Whether the loss of revenues involved is counterbalanced by the public interest and the greater ability of the agency to assess the lawfulness of the proposed rates, is a matter left by the Congress to the Commission. It is not for us to make this determination and, in fact, this appeal is limited to the question of agency authority and does not raise the question of abuse of discretion. The argument that the result here would permit the FCC to make gross changes of time which would pervert the statutory grant is not relevant. We are not here presented with such a case or claim and see no point in anticipating such an event. We find no dearth of justiciable controversies to keep us otherwise occupied.

Petition denied.