236 So.2d 198 (1970)
EXCHANGE NATIONAL BANK OF WINTER HAVEN, a National Banking Corporation, Appellant,
v.
Fred BESHARA, Appellee.
No. 69-365.
District Court of Appeal of Florida, Second District.
June 3, 1970.
Rehearing Denied June 26, 1970.
*199 R. Scott Bunn, of Straughn & Sharit, Winter Haven, for appellant.
C.A. Boswell, of Boswell & Boswell, Bartow, for appellee.
McNULTY, Judge.
Appellant-Bank, plaintiff below, appeals from a final order of dismissal of its suit on a certain check, drawn by appellee-Beshara, upon which payment was stopped.
The undisputed facts are that Beshara was a general contractor in the construction of certain improvements on real property in Polk County, and Sanelco, Inc. (hereinafter Sanelco) was an electrical subcontractor on the job. Sanelco was theretofore indebteded to appellant-Bank in substantial sums, and to secure the debt had entered into a "Security Agreement" with the Bank whereby it assigned to the Bank all its past, present and future accounts receivable and all contractual rights in and concerning its various transactions as an electrical contractor. Pursuant to this agreement Sanelco notified Beshara that all progress payments on its subcontract with Beshara were to be paid jointly to the Bank and Sanelco. In accordance therewith, Beshara issued the check herein on April 15, 1968, in the sum of $18,000.00, payable to the order of the Bank and Sanelco as co-payees. On April 19, 1968, the check was endorsed and the Bank, notwithstanding that it had an option under the aforesaid Security Agreement to credit a special account from which it had exclusive rights to withdraw, gave immediate credit to Sanelco's account at the Bank. (We assume from the identity of the parties *200 to this cause, from the posture of the case, and since it is not contended otherwise, that Sanelco's account had a nominal balance as of the date of this deposit.) Sanelco then drew numerous checks on this account totalling $18,185.64. Some of these checks were paid to various creditors of Sanelco; but seven checks, totalling $11,232.73, were applied to the account or for the use of both the Bank and Sanelco, including three checks totalling $8,403.00 which were payable to the Bank in part payment of Sanelco's antecedent debt.
Meanwhile, Beshara had determined that Sanelco had not paid materialmen on the job and that impending liens were forthcoming; whereupon, Beshara stopped payment on the check herein on April 24, 1968. Prior thereto, however, all the foregoing checks drawn by Sanelco on its account, to which the check herein was credited, had already been honored and paid by the Bank before the close of the banking day of April 19, 1968.
It is not disputed that the Bank was without actual notice of either the impending liens or the "stop payment" order prior to April 24, 1968. Nonetheless, against the Bank's contention that it was a holder in due course, the trial judge held that under the foregoing set of facts the Bank was in essence an assignee rather than a holder in due course, and, as such, took the check subject to Beshara's defenses against Sanelco. We reverse.
It is agreed, first of all, that under the Uniform Commercial Code a payee may now be a holder in due course.[1] Secondly, as has been noted, it is conceded that the Bank was without actual notice of any infirmities or defenses until payment of the check was stopped. The questions remaining, therefore, are whether appellant-Bank took the check herein for value and in good faith.[2]
We have no difficulty deciding that the check herein was taken for value. Under the Code, a holder takes the instrument for value:[3]
"(1) To the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or

(2) When he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; or

(3) When he gives a negotiable instrument for it or makes an irrevocable commitment to a third person." [Italics supplied]
While it appears that the facts herein may well satisfy all three paragraphs of criteria in one way or another, we need not go beyond the requirements of paragraph (1) because, clearly, the Bank acquired a security interest in the check before us. Alluding again to the Code:[4]
"(1) A bank has a security interest in an item and any accompanying documents or the proceeds of either:
(a) In case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied."
And, again:[5]
"For purposes of determining its status as a holder in due course, the bank has given value to the extent that it has a security interest in an item provided that the bank otherwise complies with the requirements of § 673.3-302 on what constitutes a holder in due course."
Therefore, by crediting Sanelco's account in the full amount of the check herein, and *201 by honoring the checks drawn by Sanelco, which equalled or exceeded that amount, the Bank thereupon acquired a security interest in the check to the extent of the full amount thereof. This is so, furthermore, notwithstanding that three of Sanelco's checks, totalling $8,403.00, were made payable back to the Bank in partial liquidation of its indebtedness to the Bank.[6]
Turning now to the issue of "good faith" we again refer to the Code. It is expressly provided therein that: "`Good faith' means honesty in fact in the conduct or transaction concerned."[7] Nevertheless, and without alleging any express dishonesty, appellee contends that the Bank is guilty of bad faith in this case. Indeed, he pleaded that the Bank was guilty of constructive fraud against him. In support of his position he apparently relies on the provisions of the aforesaid Security Agreement between the Bank and Sanelco which provides for the special account referred to earlier. He submits that because the Bank chose to credit Sanelco's account directly and immediately, instead of exercising its contractual right to first credit the special account over which the Bank alone had control, it had "violated" its agreement with Sanelco and thereby acted wrongfully and in bad faith to his detriment. By so doing, it is said, the Bank put Sanelco in a position to use the proceeds of the check for purposes other than in payment to its materialmen. This position is patently untenable.
In the first place, the Security Agreement in question was simply collateral for the loans or advances made to Sanelco. There is nothing contained therein, nor does Beshara suggest that there is, which makes the Bank an alter ego of Sanelco, or which gives the Bank the right to oversee the business activities of, or to exercise any dominion or control over, Sanelco so as to charge the Bank with constructive knowledge of Sanelco's affairs, except as to monies collected under its contracts; and even then only to the extent necessary to secure Sanelco's indebtedness to the Bank. Moreover, the Bank was not a party or privy to any transaction between Sanelco and Beshara, so it is not chargeable with notice of infirmities on that account.[8] Additionally, it is not even argued that the Bank's dealings with Sanelco, or the Security Agreement itself, were not in conformity with the usual commercial banking practices.
Finally, it doesn't follow that the Bank's failure to hold the check in question, or to delay it by channeling it through the special account above-referred to, amounted to dishonesty or bad faith. Nor did the Bank "violate" its agreement because it didn't exercise the option given to it under the agreement. Absent very unusual stipulations requiring otherwise, every holder of a negotiable instrument has an option not to transfer or renegotiate the instrument immediately; so if Beshara's contention is sound, the same argument could be asserted against any holder of a negotiable instrument, who might otherwise be a holder in due course, if he immediately transfers or negotiates the instrument. Nothing in the history of the law merchant ever required a holder in due course to hold or delay, in any manner, any negotiable instrument to await notice of possible infirmities therein. To the contrary, such a requirement would be anathema to the very purpose of the "holder in due course" concept which was conceived to stimulate certainty, confidence and expediency in commercial paper transactions.[9]
We are of the view, therefore, that under the facts herein appellant-Bank was a holder in due course, and it was error to dismiss its action. Accordingly, this cause *202 should be, and it is, reversed for further proceedings not inconsistent herewith.
Reversed.
LILES, Acting C.J., and PIERCE, J. concur.
NOTES
[1] § 673.3-302(2), F.S.A., which became effective January 1, 1967.
[2] § 673.3-302(1), F.S.A.
[3] § 673.3-303, F.S.A.
[4] § 674.4-208(1) (a), F.S.A.
[5] § 674.4-209, F.S.A.
[6] See, Waltham Citizens National Bank v. Flett (1968), 353 Mass. 696, 234 N.E.2d 739.
[7] § 671.1-201(19), F.S.A.
[8] See, Factory and Mill Supply Co., Inc. v. Waller Construction Corp. (N.Y. 1964), 44 Misc.2d 802, 254 N.Y.S.2d 672.
[9] See, e.g., 10 C.J.S., Bills and Notes, § 14.