In the Matter of **MUTUAL LEASING CORP., Bankrupt.**

**MIAMI NATIONAL BANK, Appellant-Cross Appellee,**

v.

**David HUGHES, Trustee, Appellee-Cross Appellant.**

No. 71–1847

**Summary Calendar.**\*

United States Court of Appeals, Fifth Circuit.

Oct. 12, 1971.

---

\* [1] Rule 18, 5th Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Joseph F. Jennings, Bradford, Williams, McKay, Kimbrell, Hamann & Jennings, P. A., Miami, Fla., Howard R. Hirsch, Miami Beach, Fla., for Miami National Bank.

Robert E. Venney, John H. Gunn, Robert W. Rust, U. S. Atty., Miami, Fla., for David Hughes, Trustee.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

The District Court denied a petition filed by the Miami National Bank for Review of an Order and Report (Count III) by the Referee in Bankruptcy dated July 3, 1969.

The Trustee of the Bankrupt cross appeals from the denial of his petition as to Count II.

Mutual Leasing Corporation, the Bankrupt, was organized in April, 1965, by Sidney Stern and Israel Lubin for the purpose of engaging in the commercial leasing of automobiles. In October, 1965, Mutual began a series of financing transactions with Miami National Bank. Mutual would take title to the motor vehicles in its name and would execute a promissory note and a chattel mortgage on the automobile in favor of the Bank. This same automobile would then be leased by Mutual to a lessee already waiting for delivery of a specified vehicle.

By the end of 1965, the Bank had financed the purchase of sixty-four vehicles by Mutual. The line of credit then outstanding to Mutual was approximately $250,000, which was the maximum sum the Bank could loan to any one customer under the provisions of 12 U.S.C., Section 84.[1]

When it became apparent that the Bank could not legally loan Mutual any additional funds, Stern and Lubin with the complicity of Kenneth Harris, Vice-President and Installment Loan Manager of the Bank, devised a plan for the evasion of the ten per centum limitation of the federal statute. Under this scheme, subsequent motor vehicle transactions were to be handled in a manner purporting to show each such vehicle transaction as a separate financing agreement with a specific individual, the lessee of the vehicle. The Bank would accept a chattel mortgage and a promis-

---

1. The pertinent provisions of this statute are as follows:

The total obligations to any national banking association of any person, co-partnership, association, or corporation shall at no time exceed 10 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund.

sory note which used the name of the lessee as the promisor and mortgagor, knowing full well that Mutual had obtained the signature of the said lessee on the chattel mortgage and promissory note by deceitfully representing these documents to be additional lease documents. The documents were actually signed in blank by the individual lessee and subsequently filled in at the Bank. Mutual arranged for registration of the title of the vehicle in the lessee's name but obtained—again by deceitful representations—the signature of the lessee on power-of-attorney and other motor vehicle forms which would permit transfer of the titles thereafter.

From January, 1966, until April 27, 1966, the Bank financed approximately 480 vehicles under the scheme described in the foregoing paragraph. In each instance, Mutual entered into lease agreements with the individual "lessees" even though the record title of each vehicle was not in Mutual but rather in the "lessee". As between Mutual and the Bank, however, the transactions were set up in such a manner as to allow Mutual to collect the lease payments directly from the "lessees" and then remit the necessary amounts under the chattel mortgages and promissory notes in the name of the "lessees" to the Bank.

The record is inconclusive as to any personal knowledge of the Harris-Stern-Lubin scheme by any official of the Bank other than Harris, but it does establish that the Bank's own files—maintained during January through April, 1966, with regard to these 480 vehicle transactions—made reference to Mutual in various papers, contained insurance policies naming Mutual as an insured, and were handled by the clerical staff of the Installment Loan Department as part of the "Mutual Account". (This was sufficient, in the opinion of the Bankruptcy Court, to put the Bank on notice as to the unusual involvement by Mutual in these transactions).

In March, 1966, new officers took control of the Bank, and in April of that year the Mutual account came to the attention of one Rubin Zerlin, who had just become Chairman of the Examining Committee of the Bank. Zerlin testified that the Mutual account came to his attention because of its large "loan involvement". He further testified that the outstanding balance on the sixty-four direct loan transactions was approximately $240,000, while the outstanding balance on other obligations, involving Mutual on "contingent" liability, was approximately $660,000. This "contingent" liability was due to the financing of vehicle purchases under the illegal Harris-Stern-Lubin scheme.

Zerlin advised Stern and Lubin that he wanted a complete explanation of just what was going on. He set a conference for that purpose on April 27, 1966. At this meeting, at the Bank, all of the details of the scheme came out. Zerlin expressed shock at "the situation" and was particularly concerned about some missing titles and the value of the loans involved. Lubin assured Zerlin that all the outstanding loans were current and in good order, and that proper titles and other necessary documentation did exist.

Zerlin, of course, was not satisfied. He informed Lubin and Stern that the Bank would make no further loans to Mutual. He also stated that he was "calling their loans" because of the "situation". Neither at this meeting nor at any time thereafter did the Bank ever issue a letter or any other writing whatsoever specifically exercising a claimed right to accelerate any particular loans or specifically setting off any accelerated loans against the commercial checking account which Mutual maintained at the Bank.

As of April 27, 1966, all the loans obtained by Mutual under the direct lending procedure were current between Mutual and the Bank, as were all the lease payments between Mutual and the lessees. Also on this date, all but two or three of the 480 vehicle transactions under the evasive and illegal scheme were current in their payment, both from the "lessee" to Mutual and from Mutual to the Bank.

On April 28, 1966, the Bank suspended any further debtor-creditor relation-

ship between itself and Mutual and took complete control and dominion over Mutual's checking account. From April 28, 1966, to May 17, 1966, the day that Mutual's account was finally closed out, the Bank refused, on a selective basis, to honor numerous checks drawn on Mutual's account. Deposits received and accepted by the Bank on April 28 raised the balance in Mutual's account to the sum of $85,440.89. Thereafter, various additional deposits were received and accepted by the Bank until May 12. Checks not permitted to clear the account were returned with the notation "Refer to Maker". During this period, the Bank had approved for payment from the account of Mutual Leasing checks totaling $22,034.02, while checks totaling $76,541.94 were rejected.

On May 1, 1966, the Bank demanded that Mutual assign to it the purported "lessor" rights which it held in each of the 480 vehicles that had been financed under the Harris-Stern-Lubin scheme, in order that the Bank could proceed to deal directly with the "lessees" holding the same. Lubin agreed to these demands and executed all of the 480 requested documents on that day.

The dishonoring of Mutual's checks by the Bank after April 27, 1966, put an end to Mutual's ability to get credit, not only with Miami National Bank but also with other banks and financial institutions with which it had been dealing. Moreover, many of the checks dishonored were those payable to automobile dealers for automobiles delivered to Mutual on open account with the expectation of immediate payment on delivery. This triggered a frantic scramble by automobile dealers, who descended upon the Mutual premises and physically took possession of any and all vehicles to which they felt they could assert any claim whatsoever. The lack of credit and the seizure of automobiles, together with the resulting notoriety in the business community, carried Mutual's leasing operations over the brink by June, 1966.

The bankruptcy proceedings were commenced by an involuntary petition filed by creditors on August 22, 1966. The debtor was adjudicated a bankrupt by an order entered October 5, 1966.

## COUNT II

Under Count II of his Petition for Affirmative Relief filed in Bankruptcy Court against the Miami National Bank, the Trustee had requested relief as to approximately 480 motor vehicles that had been processed through Mutual Leasing Corporation with financing participation by the Bank.

Pursuant to Sections 60, 67, and 70 of the Bankruptcy Act and under Florida Statute 608.55, F.S.A. incorporated by Section 70(e) of the Act, the Trustee sought to nullify transfers made to the Bank of all interest that Mutual had in these 480 vehicles. The transfers made by Israel Lubin, President of Mutual, took place on May 1, 1966, within four months of the filing of the petition initiating a proceeding under the Bankruptcy Act.

The Referee correctly found that the fundamental problem with each of the contentions asserted by the Trustee under the above mentioned statutes is that each requires, as a pre-condition to its application, that the transfer alleged to be invalid must involve property *owned by the bankrupt* at the time of the transfer.

He further found that on the face of the documents concerning the financing, or title, to the 480 vehicles that the Bankrupt had no ownership interest in any of the vehicles. All the Bankrupt had was a purported "lessor" interest in leases that covered vehicles which it did not own. None of the vehicles had ever been owned by or titled in the Bankrupt.

Therefore, the only way the Trustee could recover was to establish some equitable ownership in the vehicles on behalf of Mutual by virtue of the agreements and understandings between Harris, Stern, and Lubin as to their initial financing or to assert his right to marshal assets on behalf of the creditors of the bankrupt. However, to establish such rights on behalf of Mutual in the

present case would require the recognition and enforcement of agreements between these parties which had as their direct and deliberate object the deceitful evasion and violation of a federal statute. The Referee, choosing not to become a party to the affirmative enforcement of such a scheme, denied the requested relief. The District Court affirmed, and the Trustee appealed.

We think it is clear, as did the Referee, that the only way by which the Trustee could claim a property right in the vehicles would be the adjudication of an equitable ownership or other interest in the vehicles. To do so would be to validate and enforce the fraudulent Harris-Stern-Lubin scheme which was hatched by these men for the purpose of evading the limitations of a federal statute. This cannot be done.

We do not ignore the greater strength of the Trustee's position as compared to that of the Bankrupt. Nor do we forget that our refusal to approve the affirmative enforcement of this fraudulent scheme may leave the Miami National Bank with undeserved benefits from the 480 vehicles in question to the harm of innocent non-participating creditors of the Bankrupt.

This does not change the fact that there is no authority by which equity can come to the aid of an illegal and fraudulent scheme, regardless of the beneficence of the ultimate purpose.

The case of Schneider v. O'Neal, 8 Cir., 1957, 243 F.2d 914, cited by the cross-appellant, cannot change this view. In that case the Court did not enforce an illegal transaction in order to achieve the end result.

## COUNT III

Count III of the Trustee's Petition for Affirmative Relief against the Miami National Bank involved the sum of $85,440.89 which Mutual Leasing Corporation had on deposit in said Bank on April 28, 1966, the date on which the Bank took dominion and control over Mutual's checking account.

Finding that the Bank did not have legally sufficient grounds on April 27, 1966, for acceleration of the underlying debt that had been accumulated because of the sixty-four vehicle financing transactions which were entered into directly between itself and Mutual in the latter part of 1965, and further finding that even if the Bank had grounds for such an acceleration, its inconsistent conduct did not amount to an effective exercise of any such rights of acceleration and set-off, the Referee in Bankruptcy directed the Miami National Bank to pay over to the Trustee the above mentioned sum of money. The District Court affirmed, from which Miami National Bank appeals.

The printed promissory notes executed by Mutual in favor of the Bank contained language providing for acceleration without notice when there was "such a change in the condition of affairs, financial or otherwise * * * (Mutual) * * * as in the opinion of the payee hereof will increase the risk".

The obvious answer to this proviso there had been no change at all "in the condition of affairs, financial or otherwise" on April 27, 1966. Moreover, there was nothing that the Bank had not known all along, even from the first day of the illegal journey. Granting that the new officers had not known it, their Bank had. In any event, there had been no change in Mutual. Their accounts were current. Further granting that the new officers had to do something to correct an obviously illegal situation, they had no authority to accelerate. What they did do brought on the hailstorm, as inevitably it was bound to do.

As of April 27, 1966, nothing with regard to the status of *the sixty-four vehicle loans* on which the Bank accelerated the underlying debt would have justified such an acceleration. All were current in payment, supported by valid and proper security documents, and collaterally secured by assignment of Mutual's rights in the various lease transactions which were themselves approved by the Bank after its officers had passed upon

**816**

the qualifications of each proposed lessee. There was no impropriety in the manner in which the sixty-four loans were obtained. They were valid, good-faith loans made in conformity with accepted banking principles.

Having found that valid grounds did not exist which would have justified an acceleration, this Court finds it unnecessary to determine whether after ostensibly freezing Mutual's checking account, the Bank, by its course of conduct of accepting deposits made by Mutual and yet refusing to honor some checks drawn on Mutual's account waived its right to a set-off.

We feel, as did the Referee, that the date (April 28, 1966) of the Bank's unjustified assertion of complete control over the Bankrupt's account fixed the time for measuring the Bank's responsibility to account to the Trustee for funds of the Bankrupt present in that account. Therefore, the Referee was correct in ordering the Bank to pay over to the Trustee the sum of $85,440.89, which was the sum present in Mutual's checking account on that date.

Affirmed.