**UNITED STATES of America, Plaintiff-Appellee,**

v.

**SECOND NATIONAL BANK OF NORTH MIAMI, Defendant-Appellant.**

**No. 73-2586.**

United States Court of Appeals, Fifth Circuit.

Oct. 4, 1974.

Rehearing Denied Oct. 31, 1974.

Sheldon Rosenberg, North Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Melvyn L. Ames, Asst. U. S. Atty., Miami, Fla., Scott P. Crampton, Asst. Atty. Gen.,

Meyer Rothwacks, Tax Div., Dept. of Justice, Robert E. Noel, Atty., Tax Div., Internal Revenue Service, Bennet N. Hollander, Arthur L. Bailey, Tax Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before WISDOM and GOLDBERG, Circuit Judges, and LYNNE, District Judge.

GOLDBERG, Circuit Judge:

A little-known weapon in the government's tax collection arsenal has turned a bank employee's mistake into a banker's nightmare. Originally financial go-between for a harried general contractor and a financially-troubled subcontractor, the Second National Bank of North Miami now finds itself caught between the relentless federal tax collector and a resourceful taxpayer. The hapless bank appeals an adverse judgment which has left it holding the bag of someone else's tax liability. We affirm.

## I. FACTS

The skeletal framework of this controversy is undisputed although several important factual details remain bones of contention. In the fall of 1970 Medallion Electric Company, Inc. [Medallion], an electrical subcontractor working for The Hannon Company [Hannon] on the construction of the Midway Mall Shopping Center in Dade County, Florida, began having difficulties meeting its payroll and setting aside sufficient amounts to pay withholding taxes due the United States. After a series of payroll checks drawn on defendant-appellant Second National Bank [bank] were returned unpaid due to insufficient funds, the business agent of Medallion's employees' union, acting pursuant to the contract with Medallion, refused to accept further payroll payments except in the form of cash, cashiers' checks, or the equivalent. To meet the union's demand and to prevent further interruptions in the progress of the construction, Medallion and Hannon arranged a net payroll financing operation with appellant bank as financial intermediary.

Under the arrangement Hannon would draw a check in the amount of the net payroll on its account at City National Bank to the joint order of appellant bank and Medallion, and would deposit this check in Medallion's payroll account at appellant bank, where Medallion also maintained a general account.[1] With these funds Medallion would purchase 190 individual money orders signed and issued by appellant. Working from a payroll schedule furnished by Medallion, appellant would prepare each money order with the payee blank but in the exact amount of an employee's net weekly wages. Medallion would then fill in the name of the employee-payee. No withholding tax was set aside.

The bank issued the first set of 190 money orders on or about October 5, 1970. Because an influential bank customer had guaranteed Hannon's check, appellant bank issued the money orders on uncollected funds, that is, before Hannon's check had cleared City National Bank. Medallion received the money orders, filled in the names of the employees, and met the payroll. Subsequently Hannon's check cleared and was paid by City National Bank.

Sometime before appellant was to issue the second series of money orders, employees of the Internal Revenue Service met with Medallion representatives, including Leonard Gutkin, president of Medallion, and Alphonse Schwitalla, Medallion's attorney, regarding Medallion's withholding taxes for the third quarter of 1970.[2] Although who said what to whom and in what tone of voice is a matter of some dispute, it is clear that Medallion agreed to turn the second set of money orders over to the IRS for application against existing tax liability.

On October 14 Hannon's second check, in the amount of $83,000, was delivered to appellant and credited to Medallion's payroll account. Since no one had guaranteed payment of this check, appellant's president, Alfred Slobusky, did not, as he had done the first week, approve the issuance of the money orders on uncollected funds. Unfortunately, after telephoning City National Bank to verify that Hannon had sufficient funds on deposit to cover the check, appellant's assistant cashier followed the previous week's procedure and issued the 190 money orders in the total face amount of $92,355.86.[3] Medallion then delivered the money orders to the IRS, which inserted in each payee blank the words "to the order of the Internal Revenue Service, Room 426, 51 S.W. 1st Avenue, Miami, Florida, 33130."

On learning from Medallion's employees that they had not been paid, Hannon stopped payment on the $83,000 check, which had not yet cleared City National Bank. In its turn appellant stopped payment on the money orders, and immediately informed the Collection Division of the IRS of its reasons for the action. On October 27 the money orders were presented for payment and returned unpaid. In the meantime, Hannon paid the regular net wages to Medallion's employees, as well as an additional $10,000 in penalty payments due under Medallion's union contract for late payment of wages. Thereafter Hannon sued appellant in state court to recover the penalty payments, and won a $10,000 judgment, which appellant has paid.

The United States filed suit in the United States District Court to reduce its claim on the money orders to judgment and to foreclose a statutory lien on appellant's assets, asserted pursuant to

1. Apparently these checks were intended to be partial payments for work already completed by Medallion rather than extensions of credit.

2. Although the quarter ended in September 1970, Medallion's tax return for the period was not due until the end of October.

3. Hannon's October 14 check, for $83,000, was insufficient to cover Medallion's payroll for the week; on discovering the shortage from appellant's assistant cashier, however, Hannon wired the necessary additional funds, $9,434.61, to appellant, which then credited the funds to Medallion's account.

26 U.S.C. § 6311(b)(2). The bank denied liability on the money orders, and in addition filed a counterclaim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), to recover the amount of the judgment paid by the bank in Hannon's state courts suit. Following a bench trial the district court held that the United States is a holder in due course of the money orders; that the bank is liable to the United States in the amount of $92,355.86, the face amount of the money orders, plus interest; that a lien exists in favor of the United States on all bank assets to secure payment of the judgment; and that the counterclaim is meritless. The bank raises four issues on appeal, which we treat *seriatim*.

## II. APPLICABILITY OF SECTION 6311

Appellant's first line of attack focuses on the statutory underpinnings of the judgment below. Section 6311 in its entirety provides:

*Payment by check or money order*

*(a) Authority to receive.*—It shall be lawful for the Secretary or his delegate to receive for internal revenue taxes, or in payment for internal revenue stamps, checks or money orders, to the extent and under the conditions provided in regulations prescribed by the Secretary or his delegate.

*(b) Check or money order unpaid.*—

*(1) Ultimate liability.*—If a check or money order so received is not duly paid, the person by whom such check or money order has been tendered shall remain liable for the payment of the tax or for the stamps, and for all legal penalties and additions, to the same extent as if such check or money order had not been tendered.

*(2) Liability of banks and others.*—If any certified, treasurer's, or cashier's check or any money order so received is not duly paid, the

United States shall, in addition to its right to exact payment from the party originally indebted therefor, have a lien for the amount of such check upon all the assets of the bank or trust company on which drawn or for the amount of such money order upon all the assets of the issuer thereof; and such amount shall be paid out of such assets in preference to any other claims whatsoever against such bank or issuer except the necessary costs and expenses of administration and the reimbursement of the United States for the amount expended in the redemption of the circulating notes of such bank.

Appellant asseverates that the statutory lien provision applies only when (a) money orders or other negotiable instruments have been drawn explicitly in payment for taxes *and* (b) the bank has received sufficient funds to cover the instruments *and* (c) the bank has either failed or closed due to a bank holiday of the sort common during the 1930's. Since none of these conditions existed in the case at bar, bank argues, the district court should have refused to impose a lien on the bank's assets in favor of the United States. We disagree.

■■ Our review of appellant's applicability argument must begin with the principle that our duty "is to give effect to the intent of Congress, and in doing so our first reference is . . . to the literal meaning of the words employed." Flora v. United States, 1958, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L. Ed.2d 1165, 1167. "Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning." Perry v. Commerce Loan Co., 1966, 383 U.S. 392, 400, 86 S.Ct. 852, 857, 15 L.Ed.2d 827, 833, quoting United States v. American Trucking Associations, 1940, 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L.Ed. 1345, 1350; Ray Baille Trash Hauling, Inc. v. Kleppe, 5 Cir. 1973, 477 F.2d 696, 707. And we must be constantly mindful that

there is no need to refer to the legislative history where the statutory language is clear. "The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 615, 89 L.Ed. 921, 933 (1945). Ex parte Collett, 1949, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207, 1211; General Electric Co. v. Southern Construction Co., 5 Cir. 1967, 383 F.2d 135, 138 & n. 2, cert. denied, 1968, 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148.

■■■ We are convinced that on careful, reasonable examination, the text of section 6311 yields a plain, unambiguous meaning. The statute allows taxpayers to use certain types of negotiable instruments in paying their internal revenue taxes. In addition it supplies two means of protecting the interests of the United States in the event the particular negotiable instrument is not duly paid: the taxpayer remains liable for the taxes; and the United States may also have a lien on the assets of the bank or trust company that issued or on which the instrument was drawn.[4] Bank complains of the harsh result from this plain, common-sense reading of the statute. Our answer must be that we cannot "discard the plain substance of a statute because of theoretical and irrelevant ambiguities" and that "[h]arshness does not in itself constitute ambiguity." First National City Bank v. Compania de Aguaceros, S.A., 5 Cir. 1968, 398 F.2d 779, 784. We see nothing in the statutory language to suggest the limitations proposed by the bank; and giving the statute its obvious, apparent meaning, we can find no error in the decision of the trial court to apply it to the facts of the instant case.

Ordinarily, the determination that a statute has, on its face, a plain, unambiguous meaning obviates the necessity for extended statutory interpretation. Appellant insists, however, that we must accept its restrictive reading of the statute if we are to avoid colliding with clearly established legislative purpose. Pointing to the history, case law, and regulations pertaining to § 6311, appellant argues that "the purpose of this statute is to enable the United States to maintain a preferential position as against general creditors under circumstances . . . where checks, certified by the defendant bank and forwarded to the collector of Internal Revenue, were not paid by reason of a bank holiday proclaimed by the President of the United States." Reply Brief of Appellant at 16.

■■■ The courts of this country have long disfavored the rigid rule of our English brethren that "If Parliament does not mean what it says it must say so." C. I. R. v. Mercantile National Bank, 5 Cir. 1960, 276 F.2d 58; see C. Nutting, S. Elliott, & R. Dickerson, Legislation—Cases and Materials · 413–14 (1969). For example, in Church of the Holy Trinity v. United States, 1892, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226, 228, the Supreme Court said:

> It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. . . . [F]or frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

---

4. As we read the statute, the placement of the first-preference provision in a separate clause of § 6311(b)(2) means that this is an additional protection for the United States, not as the bank would have it, the only protection.

The Court has also noted that "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has [frequently] followed that purpose, rather than the literal words." United States v. American Trucking Associations, 1940, 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, 1350, quoted in Perry v. Commerce Loan Co., 1966, 383 U.S. 392, 400, 86 S.Ct. 852, 15 L.Ed.2d 827, 833–834; *accord*, United States v. Public Utilities Commission, 1953, 345 U.S. 295, 315, 73 S.Ct. 706, 97 L.Ed. 1020, 1037; Brennan v. Greene's Propane Gas Service, Inc., 5 Cir. 1973, 479 F.2d 1027, 1030 & n. 10; *see* United States v. Louisiana, E.D.La.1963, 225 F. Supp. 353, 361 (Wisdom, Circuit Judge), aff'd, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709. When faced with an argument that the literal meaning of a statute is at variance with the legislative purpose, a court can follow no better guide than Sir Edward Coke's "Mischief Rule": "The Office of Judges is always to make such construction as to suppress the Mischief and advance the Remedy; and to suppress subtle Inventions and Evasions for Continuance of the Mischief." Heydon's Case, 3 Co. 7a, 7b, Magdalon College Case, 11 Co. 66b, 73b, quoted in Burstein v. United States

Lines, Co., 2 Cir. 1943, 134 F.2d 89; *accord*, Miller v. Lykes Brothers Steamship Co., 5 Cir. 1972, 467 F.2d 464, 467; Richland Development Co. v. Staples, 5 Cir. 1961, 295 F.2d 122, 128; Stanga v. McCormick Shipping Corp., 5 Cir. 1959, 268 F.2d 544, 549.

With the aid of the Historical Note following 26 U.S.C. § 6311, the historical lineage of the statutory lien provision is not difficult to trace.[5] The genesis was apparently "An Act To Authorize the receipt of certified checks drawn on national and State banks for duties on imports and internal taxes, and for other purposes," Act of Mar. 2, 1911, ch. 191, § 1, 36 Stat. 965.[6] The abbreviated legislative history of this statute clearly indicates that the statute was intended to relieve taxpayers of the inconvenience, inefficiency, and danger concomitant with the then current requirement that all customs duties be paid in actual cash or gold. The first-lien provision was designed to protect against all possibility of loss the interests of both the United States and the revenue collectors, who at that time retained liability for taxes collected until payment was final.[7] Nothing in either the House Committee Report or the debates accompanying passage of the statute suggests the restrictive interpretation proposed by appellant.[8] In 1913 the statute was

5. In undertaking to probe the legislative history of this statute, we are wary of the dangers of reaching a decision that, in the eloquent words of Mr. Justice Jackson,

> pulls federal law, not only out of the dark where it has been hidden, but into a fog in which little can be seen if found. Legislative history here as usual is more vague than the statute we are called upon to interpret.

United States v. Public Utilities Commission, 1953, 345 U.S. 295, 320, 73 S.Ct. 706, 720, 97 L.Ed. 1020, 1040 (concurring opinion).

6. In pertinent part this statute provided that it shall be lawful for collectors of customs and of internal revenue to receive for duties on imports and internal taxes certified checks drawn on national and State banks, and trust companies . . . [No person who tenders such check shall be released from liability until the certified

check is duly paid]; and if any such check so received is not duly paid by the bank on which it is drawn and so certifying, the United States shall, in addition to its right to exact payment from the party originally indebted therefor, have a lien for the amount of such check upon all the assets of such bank . . . .

7. H.R.Rep.No.2041, 61st Cong., 3d Sess. (1911); 46 Cong.Rec. 2076, 2077–78, 2083 (1911).

8. The limited debate in both the House of Representatives and the Senate focused on whether the statute would diminish the supply of gold in the hands of the United States and whether the act should include state banks and trust companies, who it was feared would suffer competitively if omitted but over the assets of whom the authority of the United States to acquire a lien was questioned. 46 Cong.Rec. 2077, 2078, 2083,

amended in order to allow certified checks to be acceptable payment for any and all federal taxes. Act of Mar. 3, 1913, ch. 119, 37 Stat. 733.[9] Both the Committee Reports and the brief floor remarks indicate that the change was intended only to broaden the use of certified checks in payment for taxes because of favorable experience under the 1911 statute.[10] No mention was made of the lien provision, which was carried forward unchanged.

The 1911 act as amended became § 3656 of the 1939 Internal Revenue Code, Act of Feb. 10, 1939, ch. 2, 53 Stat. 1, 447.[11] Although the new code formally arranged the provisions in a different fashion,[12] the legislative history indi-

2240, 2501, 3411, 3412 (1911). One representative did remark of the lien provision "that upon failure of the bank those checks should have priority of payment," *id.* at 2077 (remarks of Rep. Mann), but we hardly think that passing reference justifies a conclusion that bank failure was the *sine qua non* of the operation of the lien provision. We note also that the Senate defeated an amendment that would have substituted a different version of the text omitting the lien provision. *Id.* at 3412.

9. The statute as amended provided, *inter alia,* that
> it shall be lawful for collecting officers to receive certified checks drawn on national and State banks and trust companies, . . . in payment for duties on imports, internal taxes, and all public dues, including special customs deposits . . . .

10. H.R.Rep.No.841, 62d Cong., 2d Sess. (1913) ; S.Rep.No.1276, 62d Cong., 2d Sess. (1913) ; 48 Cong.Rec. 8307, 8308 (1913). According to both Committee Reports, which are identical, the bill "removes all limitations as to the use of certified checks in the payment of dues by authorizing the receipt of such checks in the payment of all Government dues without further legislation."

11. At various times in the intervening years Congress passed special legislation authorizing receipt of certificates of indebtedness of the United States and uncertified checks in payment of income, war-profits, and excess profits taxes. Act of Oct. 3, 1917, ch. 63, § 1010, 40 Stat. 327 (War Revenue Act) ; Act of Feb. 24, 1919, ch. 18, § 1314, 40 Stat. 1145 (Revenue Act of 1918) ; Act of Nov. 23, 1921, ch. 136, § 1325, 42 Stat. 316 (Revenue Act of 1921). None of those statutes contained lien provisions; and both § 3656(b) of the 1939 Code and the current version of § 6311(b)(2) continue to distinguish certified checks, cashiers' checks, and treasurers' checks and money orders, which give rise to liens, from all other checks, which do not.

12. § *3656. Payment by check and money orders*
> (a) *Certified, cashiers', and treasurers' checks and money order*
> (1) *Authority to receive.* It shall be lawful for collectors to receive for internal revenue taxes or in payment of stamps to be used in payment of internal revenue taxes certified, cashiers', and treasurers' checks drawn on National and State banks and trust companies, and United States postal, bank, express, and telegraph money orders, during such time and under such regulations as the Commissioner, with the approval of the *Secretary,* may prescribe.
> (2) *Discharge of liability.*
> (A) *Check duly paid.* No person who may be indebted to the United States on account of internal revenue taxes or stamps used or to be used in payment of internal revenue taxes who shall have tendered a certified, cashier's, or treasurer's check or money order as provisional payment therefor, in accordance with the terms of this subsection, shall be released from the obligation to make ultimate payment thereof until such certified cashier's or treasurer's check or money order so received has been duly paid.
> (B) *Check unpaid.* If any such check or money order so received is not duly paid the United States shall, in addition to its right to exact payment from the party originally indebted therefor, have a lien for the amount of such check upon all the assets of the bank on which drawn or for the amount of such money order upon all the assets of the issuer thereof; and such amount shall be paid out of its assets in preference to any or all other claims whatsoever against said bank or issuer except the necessary costs and expenses of administration and the reimbursement of the United States for the amount expended in the redemption of the circulating notes of such bank.
> (b) *Other checks.*
> (1) *Authority to receive.* Collectors may receive checks in addition to those specified in subsection (a) in payment of taxes other than those payable by stamp during such time and under such rules and regulations as the Commissioner, with the approval of the Secretary, shall prescribe.
> (2) *Ultimate liability.* If a check so received is not paid by the bank on which it is drawn the person by whom such check has been tendered shall remain liable for the payment of the tax and for all legal

cates that the act—"To Consolidate and codify the internal-revenue laws of the United States"—wrought no changes in the substance of the existing tax laws.[13] In 1944 Congress amended § 3656 to broaden the types of negotiable instruments that could be received in payment of federal taxes, Act of Dec. 22, 1944, ch. 672, 58 Stat. 912. The change, designed entirely for the convenience of taxpayers, simply extended the payment and lien provisions relating to certified checks to include cashiers' and treasurers' checks and various types of money orders.[14] Again, nothing in the legislative history suggests any intention that the plain words of the statute be narrowly interpreted.[15]

Section 3656 of the 1939 Code as amended became § 6311 of the 1954 Internal Revenue Code, 26 U.S.C. § 6311. Although the 1954 Code rearranged the provisions of § 3656, no significant substantive changes—and none at all relating to the proper interpretation of the lien provision—were made.[16]

As we read this legislative history, the statutory lien provision was designed as a counter-weight to the allowance of new methods of paying internal revenue taxes; at the same time that taxpayers were offered increased convenience, the government was to receive increased protection of its interest in receiving the taxes owing not only by retaining the right to pursue the taxpayer, but also by gaining the right to hold the respective bank or trust company for negotiable instruments not duly paid. Congress may have foreseen that the principal need for the lien protection would arise in the case of bank failures or holidays, but to assert that to be the only situation in which they desired to protect the government's interests would require the most extravagant legislative psychoanalysis. The legislature may not have predicted that a bank would someday issue negotiable money orders on funds it did not yet have in hand, but that is no justification for niggardly statutory construction. Appellant's proposed interpretation of the statute would not, in our view, suppress the mischief and advance the remedy encompassed by this law, and would on the contrary constitute a "subtle invention and evasion for continuance of the mischief."

Although we do not deny that in ascertaining the meaning and purpose of a statute "consideration must be given to . . . the operation and administration of the statute prior to litigation," [17] we can find no more support for the bank's legislative purpose argument in the case law and regulations relating to

---

penalties and additions to the same extent as if such check had not been tendered.

13. H.R.Rep.No.6, 76th Cong., 1st Sess. 3 (1939) ; S.Rep.No.20, 76th Cong., 1st Sess. 1 (1939) ; 84 Cong.Rec. 646 (1939).

14. H.R.Rep.No.2018, 78th Cong., 2d Sess. 1 (1944) ; S.Rep.No.1357, 78th Cong., 2d Sess. (1944) ; 90 Cong.Rec. 8911–12 (1944).

15. According to the House Committee Report,

The Collection of taxes will not be impaired inasmuch as all the instruments have the common characteristic that once in the hands of the collector they cannot be revoked and their acceptance would be subject to regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury.

H.R.Rep.No.2018, 78th Cong., 2d Sess. 1 (1944).

16. The only apparent substantive change effected by the 1954 Code related to payment for internal revenue stamps. Section 3656(b)(1) had limited checks other than certified, cashiers', and treasurers' and money orders to "payment of taxes other than those payable by stamp." Section 6311(a) of the 1954 Code removed this limitation as to the use of other checks in payment for internal revenue stamps. H.R. Rep.No.1337, 83d Cong., 2d Sess. ch. 64 (1954), U.S.Code Cong. & Admin.News, p. 4025; S.Rep.No.1622, 83d Cong., 2d Sess. ch. 64 (1954), U.S.Code Cong. & Admin. News, p. 4629.

17. 2 Sutherland, Statutory Construction 321 (Horack ed. 1943), quoted in Woodwork Mfg. Assn. v. NLRB, 1967, 386 U.S. 612, 620 n. 5, 87 S.Ct. 1250, 1255, 18 L.Ed.2d 357, 364 n. 5.

§ 6311 and its predecessors than we could in the legislative history. No reported decisions treat § 6311, and the few that involve prior statutory configurations offer no persuasive basis for the bank's argument.

Certainly the only case cited by appellant, American Tobacco Co. v. South Carolina National Bank, E.D.S.C.1936, 15 F.Supp. 215, offers no solace. To the extent that the decision retains vitality, a question about which we intimate no view, it stands for no more than that when because of a bank holiday a bank has refused to honor one of the particular negotiable instruments and the taxpayer has been forced to pay the taxes in another manner, the taxpayer may,

with the government's cooperation, stand in the government's shoes regarding the statutory lien.[18] Nothing in the opinion suggests that the statute's utility be limited to such a situation.

■ Moreover, even recognizing that regulations under the Internal Revenue Code are entitled to considerable weight in construing the Code, *cf.* Weeks v. Southern Bell Telephone & Telegraph Co., 5 Cir. 1969, 408 F.2d 228, 235, we find nothing ineluctable, or even persuasive, in the fragment of the regulations cited by appellant that "District Directors may accept checks drawn . . . in payment for Internal Revenue taxes . . . ." Brief for Appellant at 28, citing 26 C.F.R. § 301.6311–1(a).[19] Ap-

18. In *American Tobacco Co.* the taxpayer attempted to use three certified checks drawn on defendant bank to pay internal revenue taxes, but the checks were not paid due to a bank holiday. Subsequently the taxpayer paid the tax liability and received from the IRS both the unpaid certified checks and an assignment of the government's statutory lien against the bank's assets. When the bank refused to honor the certified checks, taxpayer brought suit. The bank argued that since the statutory lien was only for the benefit of the government, allowing the taxpayer to recover would be unjust to the other creditors of the bank. The court disagreed; reasoning that the funds originally deposited for the checks and subject to immediate demand by the government never changed in nature simply because the government chose to pursue the taxpayer rather than the lien, the court concluded that to refuse to allow taxpayer to stand in the government's shoes in enforcing the lien would only unjustly enrich general creditors with money over which they had no legitimate claim. *Accord,* Cuesta, Ray & Co. v. Newsom, 1931, 102 Fla. 853, 136 So. 551.

19. These regulations provide, *inter alia:*
 (a) *Authority to receive*—(1) *In general.* (i) District directors may accept checks drawn on any bank or trust company incorporated under the laws of the United States or under the laws of any State, Territory, or possession of the United States, or money orders in payment for internal revenue taxes, provided such checks or money orders are collectible in U. S. currency at par, and subject to the further provisions contained in this section. District directors may accept such checks or money orders in payment for in-

ternal revenue stamps to the extent and under the conditions prescribed in subparagraph (2) of this paragraph. A check or money order in payment for internal revenue taxes or internal revenue stamps should be made payable to the Internal Revenue Service. A check or money order is payable at par only if the full amount thereof is payable without any deduction for exchange or other charges. As used in this section the term "money order" means: (*a*) U. S. postal, bank, express, or telegraph money order; (*b*) money order issued by a domestic building and loan association (as defined in section 7701 (a)(19)) or by a similar association incorporated under the laws of a possession of the United States; (*c*) a money order issued by such other organization as the Commissioner may designate; and (*d*) a money order described in subdivision (ii) of this subparagraph in cases therein described. However, the district director may refuse to accept any personal check whenever he has good reason to believe that such check will not be honored upon presentment.

 . . . . .

 (b) *Checks or money order not paid*— (1) *Ultimate liability.* The person who tenders any check (whether certified or uncertified, cashier's, treasurer's, or other form of check) or money order in payment for taxes or stamps is not released from his liability until the check or money order is paid; and, if the check or money order is not duly paid, he shall also be liable for all legal penalties and additions, to the same extent as if such check or money order had not been tendered. For the penalty in case a check or money order is

pellant interprets this language to mean that a District Director may not accept a taxpayer's tender of cashiers', certified, or treasurers' checks or money orders for taxes if payment of the taxes was not the original motive for drawing the instruments. The most obvious defect in this interpretation is that it runs counter to the undisputed legislative purpose of making payment of taxes more convenient through use of negotiable instruments. We decline to affix such basically extraneous and irrelevant considerations as the taxpayer's motive in acquiring instruments onto a bank's normal obligations on the instruments.

Finally, the bank suggests that application of § 6311 to the facts of this case would constitute a taking of its property without due process in violation of the Fifth Amendment to the United States Constitution.[20] We see no merit in this argument. It has long been recognized that liens to guarantee payment of taxes are an important element of the sovereign's taxing power. See International Harvester Corp. v. Goodrich, 1956, 350 U.S. 537, 544, 76 S. Ct. 621, 100 L.Ed. 681, 689; Barkley v. Board of Levee Commissioners, 1876, 93 U.S. (23 Wall.) 258, 265, 23 L.Ed. 893, 896. And "[t]he establishment of a tax lien by Congress is an exercise of its constitutional power 'To lay and collect Taxes.' Article 1, § 8 of the Constitution. United States v. Snyder, 149 U.S. 210, 13 S.Ct. 846, 37 L.Ed. 705." Michigan v. United States, 1943, 317 U.S. 338, 340, 63 S.Ct. 302, 303, 87 L.Ed. 312, 314. The tax lien is usually attached to the property of the taxpayer though it is not extinguished simply by the transfer of the property. United States v. Bess, 1958, 357 U.S. 51, 57, 78 S.Ct. 1054, 2 L.Ed.2d 1135, 1142. Where, however, a bank has issued a money order, a very particular type of negotiable instrument whose use is controlled by a specific body of law, which is subsequently tendered for taxes, we see nothing unusual or impermissible in a decision to attach the lien to the bank's assets in the event the money order is not duly honored. This is no more than a decision to trace the taxpayer's assets. If the bank does not receive the consideration promised for the money orders, it has all the protections supplied by the law relating to negotiable instruments. The bank can really expect no more when it chooses to deal in negotiable instruments. In short, as applied to the facts of this case, § 6311 is a constitutional exercise of Congress' authority, the wisdom of which as a matter of federal tax policy is beyond our authority to judge. Glass City Bank v. United States, 1945, 326 U.S. 265, 268, 66 S.Ct. 108, 110, 90 L.Ed. 56, 59.

not duly paid, see section 6657 and § 301.-6657–1. For assessment of the amount of a check or money order not duly paid, see section 6201(a)(2)(B) and paragraph (a)(2)(ii) of § 301.6201–1.

(2) *Liability of banks and others.* If any certified, treasurer's, or cashier's check or money order is not duly paid, the United States shall have a lien for the amount of such check upon all assets of the bank or trust company on which drawn or for the amount of such money order upon the assets of the issuer thereof. The unpaid amount shall be paid out of such assets in preference to any other claims against such bank or issuer except the necessary costs and expenses of administration and the reimbursement of the United States for the amount expended in the redemption of the circulating notes of such bank. In addition, the Government has the right to exact payment from the person required to make the payment.

(c) *Payment in nonconvertible foreign currency.* For rules relating to payment of income taxes and taxes under the Federal Insurance Contributions Act in nonconvertible foreign currency, see section 6316 and the regulations thereunder. [32 F.R. 15241, Nov. 3, 1967, as amended by T.D. 7188, 37 F.R. 12795, June 29, 1972].

20. The district court apparently did not pass on this argument; appellant, however, did raise it, albeit somewhat cursorily, in both its trial brief and its oral argument to the trial judge. Thus the question is properly before us.

## III. HOLDER IN DUE COURSE

Bank next argues that even granting a broad interpretation of § 6311 it had a legal right to refuse payment on these particular money orders. Since it is not, therefore, liable to the United States on the basis of the unpaid money orders, the bank continues, the United States should not be able to claim the existence of the statutory lien. This argument requires us to turn to Florida law and the provisions of the Uniform Commercial Code, which became effective in Florida on January 1, 1967, prior to the transactions here at issue.

■■■ The keystone of the bank's argument is that the United States possessed the money orders as a simple holder, rather than as a holder in due course. Section 3–305 of the UCC provides that a holder in due course takes an instrument free from:

(1) All claims to it on the part of any person; and

(2) All defenses of any party to the instrument with whom the holder has not dealt except:

(a) Infancy, to the extent that it is a defense to a simple contract; and

(b) Such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) Such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) Discharge in insolvency proceedings; and

(e) Any other discharge of which the holder has notice when he takes the instrument.

Fla.Stat.Ann. § 673.3–305. A simple holder, by contrast, takes an instrument subject to all defenses of any party which would be available in an action on a simple contract, as well as the defenses of want or failure of consideration, non-performance of any condition precedent, non-delivery, or delivery for a special purpose. *Id.* § 673.3–306. Since the principal defense to liability raised by the bank—failure of consideration resulting from Hannon's action in stopping payment on its check for the money orders—[21] is unavailable against the IRS if it is a holder in due course, the bank can prevail only if the United States enjoys the less exalted status of mere holder.

A substantial hurdle blocks the bank's path to success in this Court. The district court explicitly found that the United States is a holder in due course of the 190 money orders. The government insists that this holding is a finding of ultimate fact, resting on certain implicit subsidiary findings of fact, and that our review is limited by the clearly erroneous rule, Fed.R.Civ.Pro. 52(a). *See* Humphrey v. Southwestern Portland Cement Co., 5 Cir. 1974, 488 F.2d 691, 694. The bank, on the other hand, characterizes the court's conclusion as a mixed question of fact and law and urges us to re-examine it free from the insulation of Rule 52(a). *See* Galena Oaks Corp. v. Scofield, 5 Cir. 1954, 218 F.2d 217; 9 C. Wright & A. Miller, Federal Practice and Procedure § 2589.

■■■ Section 3–302(1) of the UCC supplies the definition of a holder in due course: a holder in due course is a holder who takes an instrument for value, in good faith, and without notice that it is overdue or has been dishonored or of any defense against it on the part of any person. Fla.Stat.Ann. § 673.3–302(1). While the Code also provides statutory meaning for the terms "taking for value," *id.* § 673.3–303, and "notice to purchaser," *id.* § 673.3–304, it is apparent that the application of these subsidiary definitions in order to determine whether a party is a holder in due

---

21. The bank also appears to suggest the possibility of misrepresentation on the part of Medallion that the second series of money orders would be paid to the electricians. This defense, too, would be unavailable against a holder in due course.

course will very often turn heavily on the facts of a particular case. This is not to deny that.a conclusion that a party is a holder in due course might depend largely or entirely on a question of law, which would of course come to us free of the "buckler and shield" of Rule 52(a). When, as in the case at bar, however, the determination was essentially factual, it should not be reversed unless clearly erroneous. Bowling Green, Inc. v. State Street Bank and Trust Co., 1 Cir. 1970, 425 F.2d 81, 85; Blow v. Ammerman, 1965, 121 U.S.App. D.C. 351, 350 F.2d 729, 731; Walsh v. Lockart Associates, 5 Cir. 1964, 339 F.2d 417; *accord,* Sample v. Wilson, 1931, 101 Fla. 818, 134 So. 549 (on rehearing), rev'g 101 Fla. 818, 139 So. 144; Baum v. Spector, Fla.Ct.App.1968, 211 So.2d 228; *see* Commissioner v. Duberstein, 1960, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218, 1227; *cf.* In Re Pennyrich International, Inc., 5 Cir. 1973, 473 F.2d 417, 421 n. 4; Dupre v. Gaubert Industries, Inc., 5 Cir. 1968, 403 F.2d 207.

 The bank argues that the evidence in the case will not support the trial court's implicit finding that the United States received the money orders in good faith, as required of a holder in due course.[22] The bank also disputes the trial court's implicit finding that the United States did not have notice of a claim or defense to the money orders. While we concede that certain evidence supports the bank's defensive theories, two principles must guide our evaluation of appellant's challenge to the trial court's findings. First, "when district

court findings of fact are challenged '[t]he question is not simply whether the reviewing court would have found otherwise but whether the trial court could permissibly find as it did.' Movible Offshore, Inc. v. The M/V Wilken A. Falgout, 5 Cir. 1973, 471 F.2d 268, 271." Guardian Life Insurance Co. v. Eagle, 5 Cir. 1973, 484 F.2d 382, 384. Secondly, "[i]n determining whether a finding is clearly .erroneous the rule requires that due regard be given to the opportunity of the trial court to judge the credibility of the witnesses." 9 C. Wright & A. Miller, *supra,* § 2585 at 732; *accord,* United States v. Reddoch, 5 Cir. 1972, 467 F.2d 897, 898.

 On the basis of our careful review of the record as a whole, we find more than ample evidence to support the trial court's findings.[23] Because we are not "left with the definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, we must reject appellant's argument that the United States was not a holder in due course.[24]

## IV. EQUITABLE CONSIDERATIONS

As an alternative ground for relief, appellant notes the essentially equitable nature of an action to foreclose a lien and insists that dirt on the hands of the IRS agents should have made the United States an unwelcome supplicant in the equity courtroom. Conceding the absence of actionable fraud, bank nevertheless urges that *"at the very least,* the conduct of [the United States'] agents

22. Bank argues, for example, that the IRS agents engaged in conduct that effectively amounted to deliberate deception of the bank by inducing, instructing, or requiring Medallion to use the money orders for taxes, knowing that the bank had issued them for payroll. Bank also argues that the United States demonstrated its bad faith by proceeding against the bank rather than by immediately levying on Medallion's account or attempting to collect the withholding taxes from Hannon pursuant to 26 U.S.C. §§ 3505, 6672.

23. It is settled by the terms of the UCC that a payee, such as the United States in this case, may be a holder in due course. Fla. Stat.Ann. § 673.3–302(2); Exchange Nat. Bank v. Beshara, Fla.Ct.App.1970, 236 So.2d 198, 200.

24. The Government argues that under the UCC the bank lacked the right to stop payment on the money orders. We pretermit consideration of this argument as unnecessary to our disposition of the case.

in procuring and seeking to enforce such alleged lien did . . . amount to 'overreaching,' was 'unconscionable,' 'oppressive,' and 'concealed important facts,' even if such actions by plaintiff's agents were 'strictly within the law.'" Brief for Appellant at 21 (emphasis in the original).

Certainly when seeking an equitable remedy the United States is no more immune to the general principles of equity than any other litigant. Although these principles "will not be applied to frustrate the purpose of its laws or to thwart public policy," *see* Pan American Petroleum & Transport Co. v. United States, 1927, 273 U.S. 456, 506, 47 S.Ct. 416, 424, 71 L.Ed. 734, 747; Deseret Apartments v. United States, 10 Cir. 1957, 250 F.2d 457, 458, in general "there is no authority by which equity can come to the aid of an illegal and fraudulent scheme, regardless of the beneficence of the ultimate purpose." In re Mutual Leasing Corp., 5 Cir. 1971, 449 F.2d 811, 815. On the other hand, "unless the Government did something which in good conscience it should not have done, or failed to do something fair dealing required it to do, it comes into court with clean hands and is entitled to the equitable relief it obtained." *Deseret Apartments, supra,* 250 F.2d at 458.

The conduct of the IRS agents obviously disturbed the trial judge: "You keep talking about a moral issue, and to be perfectly frank with you, I don't find it a very pleasing thing that the government did here, my government, frankly . . . ." App. at 209. He nevertheless correctly perceived the real issue to be whether the government, through the IRS agents, had a lawful right to do what it did; that is, receive the money orders in payment for taxes and request that the bank honor them. Having determined that the United States acted with sufficient good faith and in ignorance of the bank's defenses to the money orders to attain the status of holder in due course, the court not surprisingly concluded that the United States was entitled to have its statutory lien enforced. On the basis of the evidence in this case we are unwilling to quarrel with the trial judge's belief that conduct insufficiently malignant to deprive a party of holder in due course status is likewise an inadequate reason for refusing to grant an equitable remedy. Whether the contamination of one seeking equity justifies the chancellor in turning a deaf ear is, in the first instance, for the chancellor to decide; we see nothing in the conduct of the IRS agents that should have compelled him to call the men pariahs.[25]

## V. COUNTER CLAIM

Finally, appellant protests the district court's rejection of its Federal Tort Claims Act counterclaim.[26] According to bank's theory of liability, the IRS agents negligently omitted to notify the bank that the money orders would not be used to pay the electricians, but rather had been tendered in payment for Medallion's taxes. The bank suggests that had it been so notified, in timely fashion, it could have notified Hannon, which in turn could have paid the electricians in time to avoid the late payment penalty for which bank was subsequently assessed in state court.

---

25. On an alternate tack bank suggests that this case is an example of a situation in which a party should not be allowed to be in effect a third-party beneficiary of one party's fraud on another. The district court obviously did not accept this theory and we see no reason to disturb that conclusion.

26. 28 U.S.C. § 1346(b) grants to federal district courts

exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The district court recognized that a private party would be liable for a failure to notify another only if an underlying duty to notify existed between the two parties. *E. g.*, Modlin v. City of Miami Beach, Fla.1967, 201 So.2d. 70, 75. Concluding that the IRS had no such duty to give notice to the bank of the delivery of the money orders, the court could find no basis for imposing liability on the United States. We detect no error in this reasoning. The fact of being a holder in due course of the money orders certainly created no legal duty on the part of the United States to notify the bank. Nor can we find the basis for such a duty in the statement from Hatahley v. United States, 1956, 351 U.S. 173, 181, 76 S.Ct. 745, 752, 100 L.Ed. 1065, 1074, relied on by appellant that " '[d]ue care' implies at least some minimal concern for the rights of others." The words "due care" point to the issue of whether a party's conduct complies with or violates a duty owed to another; they provide no independent answer to the preliminary question whether a duty exists at all.[27] Having failed to supply an affirmative answer to that initial question, the bank was not entitled to procede with its claim.[28]

## VI. CONCLUSION

This case has required us to explore one of the lesser known chambers in a labyrinthine Internal Revenue Code honeycombed with obscure passageways. But if unfamiliar and infrequently visited, section 6311(b)(2) may be understood without the specialized tools of statutory speleology. Framed in relatively straightforward English, its meaning is readily apparent; and though the unwary may find it a trap, passage around the danger is marked by accepted commercial practices and established principles of the law of negotiable instruments. Our federal tax code may appear to operate with a rigidity that makes its collectors bereft of human pity, conscience, or compassion; its operation is also an illustration that ours is a government of laws, not men.

Affirmed.

27. In *Hatahley* government agents acting pursuant to the Federal Range Code had impounded Navajo livestock unlawfully grazing on federal lands, and the Indians had filed suit against the United States under the Tort Claims Act. Since the agents had failed to comply with notice provisions of the Federal Range Code, they were found to have been trespassers whose conduct entitled the plaintiffs to recover money damages. Whether the agents' acts were, in the operative words of 28 U.S.C. § 1346(b), "negligent" or "wrongful," the crucial measure of their conduct came from the statutory duty to give notice. In the case *sub judice*, by contrast, the IRS agents were subject to no such statutory command.

In addition, as both the court below and the United States have suggested, the *Hatahley* Court made the statement cited by appellant in the course of holding inapplicable a statutory provision excepting from § 1346(b) "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation . . . ." 28 U.S.C. § 2680(a). For reasons not entirely clear to us, the government insists that the applicability of this exception is not an issue in the case at bar. Since our disposition of appellant's counterclaim argument need not turn on the issue, we omit further discussion of the point.

28. The government argues that in any event the district court lacked jurisdiction to entertain the bank's counterclaim because it is a "claim arising in respect of the assessment or collection of any tax," specifically excluded from the provisions of § 1346(b) by 28 U.S.C. § 2680(c). The bank, of course, disagrees, emphasizing that its counterclaim rests not on the conduct of the IRS agents in collecting the money orders from Medallion, but rather on the independent, separate omission relating to the bank. We need not resolve this particular dispute, and decline to do so.